In re Alicia Elizabeth HEALEY, Debtor.

Alicia Elizabeth HEALEY, Plaintiff,

v.

MASSACHUSETTS HIGHER EDUCATION, Defendant.

The EDUCATION RESOURCES INSTITUTE, INC., Plaintiff,

v.

Alicia Elizabeth HEALEY, Defendant.

Civ. Nos. 93–CV–10253–BC, 93–CV–10252–BC, Bankruptcy Nos. 92–3022, 92–3079.

United States District Court, E.D. Michigan, N.D.

Nov. 28, 1993.

Michael C. Reinert, Saginaw, MI, for plaintiff Educ. Resources Institute, Inc.

Kenneth W. Kable, Saginaw, MI, for defendant Alicia Elizabeth Healey.

## *MEMORANDUM OPINION AND ORDER*

CLELAND, District Judge.

### I. INTRODUCTION

This case is before the Court on an appeal from the decision of a United States Bankruptcy Judge which discharged the student loan debts of Appellee, Alicia Healey. Appellee is a healthy, intelligent, articulate, young woman with no dependents. She obtained a Bachelor of Arts degree from Boston College followed by a Masters degree in Education, both financed in large measure at the expense of the taxpayers. Less than a year after her final degree was conferred she sought the protection of bankruptcy law in an attempt to dissolve her responsibilities for repayment of the loans.

The Bankruptcy Court discharged these student loans, ruling that repayment of the loans would impose an "undue hardship" upon her under 11 U.S.C. § 523(a)(8)(B).

For the reasons stated herein, this Court holds that the debtor did not prove, beyond a preponderance of the evidence, that failure to discharge the debt would impose an undue hardship on her. Accordingly, the Bankruptcy Court's decision is hereby VACATED and this case is REMANDED with the instruction that Appellee's loans be declared non-dischargeable under § 523(a)(8)(B) of the Bankruptcy Code.

## II. BACKGROUND

The facts of this case are, for the most part, undisputed. Appellee was 28 years old at the time of trial in 1992. She was in good health with no dependents. She had graduated from a high school in the Boston area in 1982. She then attended Boston College, where she obtained a Bachelor of Arts degree, with a major in English, in 1986. Her undergraduate education was financed about seventy-five percent by educational loans; however, she also demonstrated a high degree of initiative in that she held various part-time jobs while attending college and during summer recesses.

Upon graduation from Boston College, Appellee worked for approximately one year as a sales assistant at two different brokerage firms in the Boston area. She then held various "temp" jobs for another year before obtaining full-time employment as a secretary at an engineering firm in Boston. Appellee worked at that firm for approximately a year and a half, earning about $19,500 annually plus full benefits.[1]

In September of 1989, Appellee decided that she wanted to become a teacher. She applied to and was accepted by Simmons College, a small, private school in Boston. At that point she obtained deferments of her obligation to make payments on her undergraduate education loan and obtained an additional loan to finance her tuition at Simmons. Appellee finished her courses at Simmons College, from which she earned a Masters degree in Education, in August of 1990.[2] At that time she was engaged to be married, and her fiance had accepted an engineering job with General Motors in Saginaw, Michigan. Appellee decided to move to Michigan with her fiance, and never looked for a teaching job in Massachusetts. She instead made approximately twenty-five to thirty inquiries by mail regarding teaching positions in the Saginaw area, eventually submitting applications for "about ten."

Despite the fact that she did not receive any positive responses to these inquiries— much less a firm offer of employment—Appellee nevertheless moved to Saginaw, Michigan with her fiance shortly after her Masters program ended, in August of 1990. She was not able to obtain a full-time teaching job in 1990, but she did secure work as a substitute teacher, earning between $35–$50 per day for the approximately four out of five days per week that she worked. Tr. 11. During the summer of 1991 she worked at a McDonald's restaurant. In the fall of 1991, Appellee interviewed and obtained a job at St. Michael's, a small Catholic school located in Pinconning, Michigan, approximately 40 miles from her shared apartment in Saginaw. Tr. 12. For her work that school year she was paid at a rate of $1000 per month for ten months work. During the next summer, 1992, she babysat her "roommate's"[3] two children.[4] In exchange for babysitting the two children for two months, Appellee was paid $50 per week. When asked by counsel if she had attempted to negotiate a better deal, Appellee testified that it was the maximum amount that her roommate, who was

---

1. Healey testified that she received an HMO health insurance plan, life insurance, and an option to buy stock. Tr. 32.

2. The degree, she testified, was conferred in October of that same year. The Court assumes that time was taken for action such as a faculty review of a concluding thesis.

3. At some point after they moved from Massachusetts to Saginaw, Michigan, Appellee and her fiance broke off their engagement. Despite the

fact that her job in Pinconning was approximately 40 miles from her apartment in Saginaw, Appellee continued to live with her erstwhile fiance, paying fully one-half the rent and expenses, and incurring nearly $200 a month in transportation expenses.

4. Healey testified that her roommate (i.e. former fiance) has two children from a previous marriage and that he has "summer custody" of them. Tr. 38.

making $55,000 per year as an engineer, could "afford to pay." [5] Tr. 38. In the fall of 1992, Appellee resumed her job as a full-time teacher for St. Michael's. She was given a raise of $600, resulting in annual income from teaching for the next ten months of $10,600.

On September 6, 1991, less than one year after receiving her Master's degree, Appellee filed a petition under Chapter 7 of the Bankruptcy Code. At that time she owed approximately $35,000 under a promissory note to Appellant Massachusetts Higher Education Assistance Corporation ("MHEAC"). This money was lent to pay for Appellee's undergraduate education at Boston College. Appellee also owed approximately $8,000 to Appellant Education Resources Institute, Inc. ("TERI"), which was used to pay for her Master's degree at Simmons College. At the time of the filing, these loan debts represented more than 90% of Appellee's total debt. On April 13, 1992, TERI filed an adversary proceeding against Appellee, seeking an order that her debt for the educational loan it had guaranteed was non-dischargeable. Appellee denied non-dischargeability and initiated her own adversary proceeding against MHEAC, asserting that the debt she owed it was similarly dischargeable. The two adversary proceedings were consolidated for trial before the Bankruptcy Judge, who determined that both debts were dischargeable under the "undue hardship" exception provided in § 523(a)(8)(B) of the Bankruptcy Code. The sole issue on this consolidated appeal is whether the Bankruptcy Judge erred in ruling that the debts were dischargeable under that section of the Code.

### III. STANDARD OF REVIEW

Section 523(a)(8)(B) of the Bankruptcy Code, states in pertinent part:

**5.** This amounts to $1.25 per hour if one assumes that she worked at this task—as a live-in substitute mother—limited to forty hours per week. The bankruptcy judge made no specific findings on this nuance, but the Court notes that various conclusions could be drawn from this kind of living arrangement, and that the common experience of human society suggests that mothers

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or a nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an *undue hardship* on the debtor and the debtor's dependents

*Id.* (emphasis added).

In an adversary proceeding, the bankruptcy court renders findings of fact and conclusions of law. This Court is bound by the bankruptcy court's findings of fact unless they are clearly erroneous. Fed.R.Bankr. 8013. The legal conclusions are reviewed *de novo*. *In re Batie*, 995 F.2d 85, 88 (6th Cir.1993). Whether or not discharging Appellee's student loans would impose on her an "undue hardship" under 11 U.S.C. § 523(a)(8)(B) requires a legal conclusion, which is to be reviewed by this Court *de novo*. *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2nd Cir.1987).

### IV. DISCUSSION

It is beyond peradventure that requiring repayment of the student loans in the instant case (and, for that matter, in almost any case), imposes a "hardship" on the debtor. It is more difficult and expensive to honor an obligation than to disregard it, and

raising small children are unable to limit their "work week" quite as readily as is the factory worker who punches a clock. In the event that she put in additional hours towards the tasks involved, of course, her per-hour rate of pay sinks below even the abysmal rate computed above.

reimbursement often means that financial resources will either be tight or not available at all for other discretionary activities. However, "[t]he fact that a debtor's budget may be tight for the foreseeable future is the norm rather than the exception." *In re Bakkum v. Great Lakes Higher Educ. Corp.,* 139 B.R. 680, 682 (Bankr.N.D.Ohio 1992) (citation omitted). The question for this Court to consider is thus not whether payment of the loans constitutes a hardship (it certainly does), but instead whether that hardship is *undue. Id.* The phrase "undue hardship" is not defined by the Bankruptcy Code, however the existence of the modifier "undue" indicates that Congress deemed "garden-variety" hardship or "unpleasantness" as an insufficient excuse for a discharge of student loans. *See In re Cahill,* 93 B.R. 8, 13 (Bankr. N.D.N.Y.1988) (citations omitted). Indeed, as one would expect by using common sense, there is a strong legislative policy *against* allowing the discharge of student loans in bankruptcy. *In re Bakkum,* 139 B.R. at 682 (citing H.R.Rep. No. 595, 95 Cong., 1st Sess. 132–33 (1977) U.S.Code Cong. & Admin.News 1978, p. 5787). The Second Circuit has set forth a standard to be used to determine what constitutes "undue hardship" for the purposes of § 523(a)(8)(B). The test requires a three-part showing:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans

*Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395, 396 (2nd Cir.1987). This standard, which assesses the totality of the circumstances, incorporates the three-tiered economic (i.e. mechanical), good faith, and policy tests set forth in *Pennsylvania Higher Education Assistance Agency v. Johnson (In re Johnson),* 5 Bankr.Ct.Dec. 532 (Bankr.E.D.Pa.1979), which several courts have adopted. *In re Cahill,* 93 B.R. 8, 13 (Bankr.N.D.N.Y.1988) (citations omitted).[6]

The Second Circuit test has been widely followed by bankruptcy courts in other circuits, including those sitting in the Seventh (*In re Conner,* 89 B.R. 744, 747 (Bankr. N.D.Ill.1988)); Eleventh (*In re Webb,* 132 B.R. 199, 201 (Bankr.M.D.Fla.1991)); and Eighth (*In re Ipsen v. Higher Educ. Assistance Fund,* 149 B.R. 583, 585 (Bankr. W.D.Mo.1992)) Circuits. Furthermore, bankruptcy courts sitting in the Sixth Circuit, including the Court below, have cited the *Brunner* test with approval. *See e.g. In re Bakkum,* 139 B.R. at 682; *In re Connor,* 83 B.R. 440, 445 (Bankr.E.D.Mich.1988). This Court agrees with those courts which have embraced the three-prong test set forth by the Second Circuit in *Brunner* and hereby adopts this standard for determining "undue hardship" under 11 U.S.C. § 523(a)(8)(B).

■ Under 11 U.S.C. § 523(a)(8)(B), the burden is divided between the parties. *In re Webb,* 132 B.R. at 201. It is incumbent upon the creditor to initially establish the existence of the debt—which is owed to, insured or guaranteed by a governmental agency or a nonprofit institution of higher learning—and that the debt first became payable less than seven years prior to the date of the filing of the petition. *Id.* (quoting *In re D'Ettore,* 106 B.R. 715, 717 (Bankr.M.D.Fla.1989)). None of these matters is in dispute in the instant case. The burden then shifts to the debtor to prove, by a fair preponderance of the evidence, that excepting her educational loans from discharge would constitute an "undue hardship." *In re Garneau,* 122 B.R. 178, 179 (Bankr.W.D.N.Y.1990); *see also In*

---

**6.** The "mechanical" test requires the court to compare a debtor's present and projected future income and expenses and surrounding circumstances to determine whether it is reasonable to require that the loan be repaid in whole or in part. *In re Bakkum,* 139 B.R. at 682–83 (citation omitted). The "good faith" test requires the court to determine whether the debtor has made a good faith effort to begin repayment of the loan, to renegotiate the loan, and to minimize expenses and maximize personal income. *Id.* Under the "policy" test, the court must examine whether or not the discharge of all or part of the student loan obligation would frustrate the Congressional policy underlying section 523(a)(8)(B). *Id.*

re Webb, 132 B.R. at 201; In re D'Ettore, 106 B.R. at 717. To satisfy her burden, the Debtor is required to establish all three prongs of the Brunner test by a preponderance of the evidence. Brunner, 831 F.2d at 396.

### Minimal Standard of Living

■ The first prong of the test requires the debtor to show that she cannot maintain, based on her current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans. Implicit within this inquiry is the requirement that the debtor demonstrate that she is actively minimizing her current household living expenses and maximizing personal and professional resources. See In re Evans, 131 B.R. 372, 375 (Bankr.S.D.Ohio 1991).

■ With respect to the minimization of expenses requirement, Appellee was expending a fairly sizeable amount—approximately $764.00 per month—for food, rent, transportation, clothing, medical costs, and telephone service. Included in this amount are such items as $35 a month in long distance phone bills "because [her] family is all out of state" and $25 monthly for "hair care and entertainment," which the debtor explained as going toward the occasional meal at a restaurant and a night out at the movies. She spends nearly $200 a month on gasoline and car care, but it is also true that she works in a city some distance from her shared apartment. Although serious questions could, and were, raised concerning the legitimacy of these amounts, this Court finds that the Bankruptcy Court did not err in determining that Appellee was minimizing her expenses.

■ The logical corollary to the requirement that a debtor minimize her expenses is that she also maximize her income. To satisfy this condition the debtor must demonstrate that she "... is making a strenuous effort to maximize her personal income within the practical limitations of her vocational profile." Id. (citing North Dakota State

Board of Higher Education v. Frech, 62 B.R. 235, 241 (Bankr.D.Minn.1986)). In the instant case, Appellee testified that during the ten months of the year that she teaches school her day runs from 8:00 a.m. to 2:00 p.m. An extra hour to hour and a half is spent grading papers. During the two months she had off in the summer, Appellee babysat for her "roommate's" two children at a rate of pay of $50 per week. On these facts the Bankruptcy Court determined that Appellee works approximately 40 hours per week throughout the year and that "[s]he should not be required to do more than that as a sign of good faith." Opinion 11.

Even assuming, as this Court shall, that the Bankruptcy Court's assessment of time spent working (i.e. about 40 hours per week averaged throughout the year) is correct,[7] it cannot agree with its legal conclusion that Appellee was "not required to do more." There was no testimony that teaching classes at St. Michael's was especially gruelling or stressful. Further, no questions were asked regarding Appellee's capacity or willingness to "moonlight" by taking on a supplementary job at night, on weekends, or during various school holidays. Finally, and perhaps most damaging to her position on this point, Appellee testified that, prior to obtaining her Masters degree, she had worked as a secretary earning nearly twice the money she was currently being paid as a parochial school teacher. When asked why she did not look for a job (perhaps one which would utilize her secretarial skills) outside of the teaching field that would pay more money, Appellee testified that:

> I had spent a good deal of time and effort and money, not my money unfortunately, to go to Simmons and get a degree. And it was what I really wanted to do and I loved it. So I—I wanted to stay in my field.

Tr. 34.

The Bankruptcy Court erred in finding that it would be unreasonable for it to, in

---

7. The Appellants point out that the Bankruptcy Court neglected to subtract the time spent for lunch each day as well as the time not worked during the numerous school holidays. See Brief 19. While the Court recognizes these deficien-

cies in the Bankruptcy Court's calculation of average hours per week worked, it will not say that the *number of hours worked*, as derived by the Bankruptcy Court, was "clearly erroneous." See, e.g., note 5, *supra*.

effect, "... require the Debtor to abandon her current position—a position which allows her to utilize her advanced training and expertise—in favor of employment that does not call upon her specialized skills." Opinion 10–11. It is in no way unreasonable, unfair or unrealistic for a person in Appellee's position to be expected to work hard—harder than most others, perhaps—and in a field which does *not* allow her specialized skills to be put to use, at least not at present. If the market does not currently value particular skills (e.g. teaching skills) highly enough to provide sufficient well-paying jobs to allow the debtor a place in that vocation, then she may be forced through circumstances to fall back on other job skills even though to her they may be not quite as sophisticated, refined or aesthetically pleasing.

How many graduates (even those who have not enjoyed a publicly funded or loan-guaranteed education) aspire to careers which they hope and believe will be personally fulfilling to them as well as financially rewarding? Almost all of them, one would hope. And how many will find that, at times, the employment which would be most satisfying personally must be abandoned, delayed or augmented if the financial rewards that are available are not sufficient to allow them to meet their financial obligations? The experience of life teaches us that, other than the privileged few, all encounter intervals in which they cannot do precisely what they desire because it simply does not pay enough money. A resolute determination to work in one's field of dreams, no matter how little it pays, cannot be the fundamental standard from which "undue hardship" under § 523(a)(8)(B) is measured.

Appellee's net annual income totaled $9,0641, or roughly $755.00 per month. The Bankruptcy Court correctly determined that, even if Appellee were to repay only the bare minimum of $54.75 per week on her loans,[8] she would be unable to maintain a "minimal" standard of living for herself based on her *current* income. In addition, the Bankruptcy Court did not err in finding that Appellee was minimizing her expenses. The Bankruptcy Court erroneously concluded, however, that Appellee was maximizing her personal resources. The Court holds that Appellee, who made no attempt to supplement her income by taking on additional work and who, despite possessing other marketable skills, did not seek to obtain higher paying work outside of her desired field, did not establish, by a fair preponderance of the evidence, that she is making a strenuous effort to maximize her personal income within the practical limitations of her vocational profile. *See North Dakota State Board of Higher Education v. Frech,* 62 B.R. 235, 241 (Bankr.D.Minn.1986).[9] Accordingly, Appellee did not satisfy the first prong of the *Brunner* test.

*Additional Circumstances*

██ Even if Appellee could somehow satisfy the first prong of the *Brunner* test her student loan debts would still not be dischargeable under § 523(a)(8)(B), as the Court's inquiry under that section is not limited to a snapshot assessment of a debtor's present ability to pay off the loans. Under the second prong of the test, Appellee must show, by a fair preponderance of the evidence, that *additional circumstances* exist indicating that the described state of affairs

**8.** Federal law specifies in pertinent part that:

[T]he maximum part of the aggregate disposable earnings of an individual for any workweek which is subjected to garnishment may not exceed

(1) 25 per centum of his disposable earnings for that week, or

(2) the amount by which his disposable earnings for that week exceed thirty times the Federal minimum hourly wage prescribed by section 206(a)(1) of Title 29 in effect at the time the earnings are payable,

whichever is less.

15 U.S.C. § 1673(a). The current minimum hourly wage is $4.25. *See* 29 U.S.C. § 206(a)(1).

Thirty times that number is $127.50, which is $91.50 less than Healey's weekly earnings of $219. Twenty-five percent of $219 is $54.75, which is less than $91.50.

**9.** *Cf. In re Evans,* 131 B.R. 372 (Bankr.S.D.Ohio 1991) (single mother of two who suffered from heart disorder, had no secretarial skills, possessed only a nine-month certificate from a disreputable trade school, who made repeated attempts to secure work in different field but lacked the necessary job skills, met showing that she was making a "strenuous effort" to maximize her personal income within the practical limitations of her vocational profile).

is likely to persist for a significant portion of the repayment period of the student loans. *See Brunner v. New York State Higher Education Services,* 831 at 396. The repayment periods for the $35,000 and $8,000 student loans owed to Appellants MHEAC and TERI are, respectively, twenty years and ten years. The Bankruptcy Court found that, based upon Appellee's testimony at trial, her income "... is not likely to increase substantially in the foreseeable future." Opinion 9. Although predicting future income is difficult, *Brunner,* 831 F.2d at 396, and although her testimony was (as the Bankruptcy Judge noted) "unrebutted," the record nevertheless demonstrates no "additional circumstances" which indicate a likelihood that Appellee's current inability to simultaneously repay the loans and maintain a minimal standard of living will extend for a significant portion of the loan repayment period.

Appellee is not disabled. She has no dependents. She is not ill or elderly. She is mentally competent, and then some. Although presently short on practical teaching experience, she is making progress on that front. *See Brunner,* 831 F.2d at 396 (debtor with Bachelor of Arts degree and Masters degree who had no dependents and was healthy, intelligent, and well-educated failed to show additional circumstances to indicate that current state of affairs was likely to persist for a significant portion of the student loans); *In re Webb,* 132 B.R. at 201 (no additional circumstances existed to indicate a likelihood that current inability to find any work would extend for significant period of time when debtor was not disabled or elderly, and was "educated, experienced, and articulate."); *cf In the Matter of Diaz,* 5 B.R. 253 (Bankr.W.D.N.Y.1980) (student loan was dischargeable when debtor could only work half a day because of physical problems, was impoverished, partially deaf, cardiac, divorced from her institutionalized husband, and had several children, some of whom required psychiatric and dental care); *In re Bagley,* 4 B.R. 248 (Bankr.D.Ariz.1980) (unemployed debtor subsisting at near welfare level, burdened with medical bills of a child with chronic respiratory illness whose condi-

tion required the care of the debtor and impeded her gainful employment, did not have any reasonable prospects of acquiring more wealth).

The record indicates that Appellee is a well-educated and articulate young woman with reasonable employment experience and a capacity to earn substantially more money than she does currently. She possesses an undergraduate degree from a prestigious institution, and a Masters Degree from a "highly regarded" (Tr. 25) and expensive [10] private school. When asked why she chose that school, Appellee stated:

> Well I knew I wanted to be a teacher and I really wanted to be good at it. And I know the competition is stiff for teaching. So I wanted to get the best advantage I could, so *I wanted the best education,* not just a certificate. I wanted a degree.
>
> \* \* \* \* \* \*
>
> And they have a good program there.... [P]eople in the teaching field know that Simmons is—has a good program.

Tr. 24. (emphasis added). Furthermore, when asked if she anticipated finding a full-time position teaching in a public school, which would pay far in excess of the $10,600 paid by the private school where she's currently employed, Appellee testified, "[i]t's probable that some day I will." Tr. 41.

Based upon this evidence, the Court finds that the Bankruptcy Court's determination that Appellee's income is not likely to increase substantially in the foreseeable future is clearly erroneous. The Court holds that Appellee has not satisfied her burden of showing that additional circumstances exist which indicate that her inability—based on current income and expenses—to maintain a "minimal" standard of living for herself if forced to repay the loans is likely to persist for a significant portion of the repayment period of the loans. *In re Bakkum,* 139 B.R. 680 (Bankr.N.D.Ohio 1992) (debtor, who was 29 years of age, in good health, single, had no dependents, possessed Bachelors and Masters degrees, held to have had good prospects of obtaining significant improvement in her financial resources). Because Appellee

---

10. Healey testified that her tuition at Simmons College exceeded $10,000 for one year. Tr. 24.

has failed to satisfy the second prong of the *Brunner* test she cannot meet her burden of establishing an "undue hardship" under 11 U.S.C. § 523(a)(8)(B).

*Good Faith Efforts to Repay*

Even assuming, *arguendo*, that Appellee could somehow satisfy both the first and second prongs of the *Brunner* test, her claim would nevertheless fail under the third prong, which requires her to show that she has made *good faith efforts* to repay the loans. *Brunner*, 831 F.2d at 396. Appellee testified that she never made a payment against the indebtedness to Appellant MHEAC ($35,000 for undergraduate loans), which first became due on June 1, 1991. With respect to the indebtedness owed to Appellant TERI ($8,000 for loans toward her Masters degree), she made one payment of $137 in May of 1991 and one payment of $37 in July of 1991. Appellee filed for bankruptcy less than one year after her Masters degree was awarded, and did so without attempting to negotiate even a payment arrangement with either of the Appellants. The evidence is replete with instances of ongoing contact between Appellee and the guarantors, thus there is no dispute as to her ability to speak up for herself in this regard. Furthermore, during the last period of forbearance—when the guarantors had been persuaded to postpone the commencement of the loan payments—Appellee's own testimony indicates that she was spending at least some time searching for a willing lawyer but no time searching for ways to honor her obligations. Appellee has failed to satisfy the third prong of the *Brunner* test because she has not established, by a preponderance of the evidence, that she has made good faith efforts to repay the loans.

### V. CONCLUSION

For the aforementioned reasons, the Court holds that the Bankruptcy Court erred in determining that excepting Appellee's student loan debts from discharge would impose an undue hardship upon her. Accordingly, the Bankruptcy Court's decision is hereby VACATED and this case is REMANDED with the instruction that Appellee's student loans be declared non-dischargeable under 11 U.S.C. § 523(a)(8)(B).

IT IS SO ORDERED.