In re Ruby Helen DAUGHERTY a/k/a Ruby Helen Newby, Debtor.

Ruby Helen DAUGHERTY, Plaintiff and Counter–Defendant,

v.

FIRST TENNESSEE BANK, Defendant and Counter–Plaintiff.

Bankruptcy No. 93–32393.
Adv. No. 93–3136.

United States Bankruptcy Court, E.D. Tennessee.

Dec. 28, 1994.

Carleton E. Bryant, IV, Knoxville, TN, for plaintiff and counter-defendant Ruby Helen Daugherty.

Goddard & Gamble, Carl P. McDonald, Maryville, TN, for defendant and counter-plaintiff First Tennessee Bank.

## MEMORANDUM

RICHARD S. STAIR, Jr., Bankruptcy Judge.

The debtor, Ruby Helen Daugherty, commenced this adversary proceeding on October 13, 1993, seeking a determination that two educational loans owing First Tennessee Bank (Bank) are dischargeable under the "undue hardship" provisions of 11 U.S.C.A.

§ 523(a)(8)(B) (West 1993). The Bank filed a Countercomplaint on January 28, 1994, seeking a determination that the educational loans are nondischargeable. It is undisputed that the loans are within the purview of § 523(a)(8) and that they first became due within seven (7) years before the debtor filed her petition under Chapter 7. The parties agree that the only issue the court is called upon to resolve is whether the debtor can avail herself of the "undue hardship" provision of subsection (B) of § 523(a)(8) which permits the court to discharge an otherwise nondischargeable educational loan, if the exception from discharge would impose an "undue hardship" on the debtor and the debtor's dependents.

This adversary proceeding was tried before the court on December 6, 1994. The parties stipulated that on the date of trial the balance of the debtor's obligation to the Bank was $9,864.83 including principal, interest, and late charges. Additionally, the Bank requests attorney's fees and expenses as provided for in its promissory notes. The debtor was the only witness to testify.

■■ The burden of proof on the issue of undue hardship is by a preponderance of the evidence and rests with the debtor. *Sands v. United Student Aid Funds, Inc. (In re Sands)*, 166 B.R. 299, 306 (Bankr.W.D.Mich. 1994); *Ford v. Tennessee Student Assistance Corp. (In re Ford)*, 151 B.R. 135, 139 (Bankr. M.D.Tenn.1993); *Zibura v. Academic Fin. Servs. Ass'n (In re Zibura)*, 128 B.R. 129, 131 (Bankr.W.D.Pa.1991).

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(I) (West 1993).

## I

The debtor is fifty-three years old. She received her undergraduate degree in 1974 from the University of Tennessee in Chattanooga. She later obtained a masters degree in communications in April 1987 from the University of Tennessee in Knoxville. The

later degree was financed by the Bank through the two educational loans presently in dispute. The first loan, obtained pursuant to an application dated sometime before October 15, 1984,[1] was in the original principal amount of $5,000.00; the second, obtained pursuant to an application dated September 23, 1985, was in the original principal amount of $1,600.00. Although payments on the loans first became due on November 1, 1986, the debtor has requested and received numerous unemployment, disability, and forbearance deferments. She has made no payments to the Bank.

The debtor contends that she suffers from physical and emotional problems that preclude her from maintaining any type of employment for an extended period of time. She testified that her illnesses make her unable to relate well with people; that she takes pain and anti-depressant medication; that she is under the care of a psychologist, Dr. Alvin Burstein, for depression;[2] that she has suffered from chronic depression all her life; and that she has, at times, been suicidal, having last attempted suicide in July 1994. She testified that her doctors have not told her she could not work. Rather, she testified that they have advised her that it would be good for her to go back to work.

The debtor further testified that her chronic depression was aggravated in February 1989 when she was struck by an automobile in the University of Tennessee area. She was hospitalized overnight for observation and released the next day. She has not been rehospitalized for any injuries sustained in this accident and her physician has found no physical disability relating to the accident. Further, she resumed work subsequent to the accident.

After obtaining her masters degree in 1987, the debtor testified that she used that degree in obtaining a teaching position at Knoxville College. She received a one-year contract and taught English from August

---

**1.** The application is not legible; however, the GSLP Master Note issued pursuant to the application is dated October 15, 1984.

**2.** The debtor's schedules reflect that she owes Dr. Burstein $10,958.00. She testified that she con-

tinues to see him and intends to pay this obligation. Neither Dr. Burstein nor any other expert testified on the nature or extent of the debtor's alleged physical or emotional impairments.

1987 to the conclusion of the academic year in May 1988. She received a salary of $15,000.00. Her contract was not renewed and she began teaching as a member of the adjunct faculty at Pellissippi State Technical Community College (Pellissippi State) in August 1988.[3] She was paid $42.50 per semester hour and taught two classes, Speech and Communications. The debtor again testified that she obtained this position because of her masters degree. The debtor's statement of employment history (Exhibit 3) states that her supervisor felt she was unable to perform her teaching duties after the February 1989 automobile accident and that her contract was accordingly terminated. However, according to this statement, she was not terminated until March 1990, over a year after the accident. The debtor was again employed by Knoxville College as an acting department head from August 1991 until May 1993 at a salary of $26,800.00 per year. She left when the school required that the position be filled by an individual with a doctoral degree.

During various times between 1988 and August 12, 1994, the debtor was employed at jobs in addition to those at Knoxville College and Pellissippi State. She worked for the United States Postal Service, CareerCom Corporation, Natural Flair Dress Shop, Anderson County Health Care, Dial–America Marketing, Knox County Board of Education, Knoxville Urban League, CPC, Inc., and Share Food Bank. The debtor has only worked sporadically since August 12, 1994. She testified that she last sent out resumes two or three months ago seeking positions in teaching, management, public relations, and

broadcasting, but that she believes her present prospects for employment to be "very slim" because her degree in communications is not highly marketable, because of her age, and because of her past employment history.

The debtor's tax returns and tax related documents establish that from 1986 through 1993 she had the following income: during 1986, she earned $4,632.75 from the United States Postal Service ($3,828.80) and the University of Tennessee ($803.95); during 1987, she earned $10,167.00 from the Postal Service ($5,167.22) and Knoxville College ($4,999.78);[4] during 1988, she earned $13,023.34 from Knoxville College ($10,000.00), the Postal Service ($944.34), and Pellissippi State ($2,079.00); during 1989, she earned approximately $6,382.94 from CareerCom Corporation ($1,152.00), Natural Flair Dress Shop ($1,258.00), the Postal Service ($807.94), Pellissippi State ($3,124.00) and Educational Testing Service ($41.00);[5] during 1990, she earned $5,726.87 from Pellissippi State ($42.50), Natural Flair Dress Shop ($604.11), Dial–America Marketing, Inc. ($202.50), Knox County, Tennessee ($535.00), and Anderson County Health Care ($4,342.76); during 1991, she earned $15,807.22 from Knox County, Tennessee ($177.00), Knoxville College ($6,733.32), Natural Flair Dress Shop ($1,078.00), and Knoxville Area Urban League, Inc. ($7,818.15); during 1992, she earned $22,199.96 from Knoxville College;[6] and during 1993, she earned $18,526.64 from Knoxville College ($13,816.64), Southern Personnel, Inc. ($270.00), and the Tennessee Department of Unemployment Security ($4,440.00).[7]

---

3. The debtor's employment history is outlined in a document filed as Exhibit 3 entitled "Employment of Ruby Daugherty Form [sic] 1985 Until 1994." This exhibit reflects that Knoxville College merged with another campus and that the debtor's contract was not renewed because the college chose to retain only tenured teachers.

4. Of the two 1987 Wage and Tax Statements appended to the debtor's 1987 Income Tax Return, only the Postal Service statement is legible. The court presumes, consistent with the debtor's testimony, that the other tax statement evidences that the balance of her earnings were from Knoxville College.

5. The debtor's 1989 Income Tax Return is not a part of the record before the court. Instead, the

various Wage and Tax Statements received from the debtor's employers during this year are filed as Exhibit 31. The Pellissippi State Wage and Tax Statement is not legible and the court reads this document as reflecting earnings from Pellissippi State in the amount of $3,124.00. The court acknowledges that it could be misreading the numbers.

6. The debtor wrote the following notation on her 1992 tax return: "Most money I ever earned in my life."

7. Earnings from the Tennessee Department of Employment Security are attributable to unemployment benefits paid to the debtor.

The debtor testified that since she filed her bankruptcy petition on June 2, 1993, she has received unemployment compensation from the State of Tennessee and has worked one or two months at Share Food Bank. She also testified that she received unemployment compensation for a period of time in 1990 as a result of her 1989 automobile accident. The debtor acknowledges that she is familiar with the eligibility requirements for unemployment compensation and that she certified in her applications filed with the State of Tennessee that she was "able and available for full-time work." Exhibit 37.

Interest began accruing on the principal balance of the disputed educational loans, $6,600.00, on October 1, 1986. The first payment became due on November 1, 1986. The debtor applied for and received an unemployment deferment from October 1, 1986, to April 1, 1987, with her payments to commence on May 1, 1987. Thereafter, she received the following additional deferments: an unemployment deferment from April 2, 1987, to August 1, 1987, with the next payment due September 1, 1987; an unemployment deferment from August 2, 1987, to October 1, 1987, with the next payment due November 1, 1987; an unemployment deferment from November 1, 1987, to February 1, 1988, with the next payment due March 1, 1988; a forbearance from March 1, 1988, to June 15, 1988, with the next payment due July 1, 1988; a forbearance from July 1, 1988, to September 15, 1988, with the next payment due October 1, 1988; an unemployment deferment from October 1, 1988, to January 1, 1989, with the next payment due February 1, 1989; a forbearance from January 10, 1989, to March 29, 1989, with the next payment due April 1, 1989; an unemployment deferment from March 30, 1989, to June 1, 1989, with the next payment due July 1, 1989; an unemployment deferment from July 1, 1989, to September 1, 1989, with the next payment due October 1, 1989; a temporary disability deferment from April 1, 1990, to January 20, 1991, with the next payment due February 1, 1991; a forbearance from February 1, 1991, to April 1, 1991, with the next payment due May 1, 1991; a temporary disability deferment from April 10, 1991, to April 10, 1992, with the next payment due May 1, 1992; an unemployment deferment from April 11, 1992, to July 11, 1992, with the next payment due August 1, 1992; and a forbearance from September 1, 1992, to January 15, 1993, with the next payment due February 1, 1993. From February 1, 1993, until June 10, 1993, the Bank endeavored to collect on the loans. Upon receiving notice of the commencement of the debtor's bankruptcy case, the Bank instituted a period of forbearance from June 2, 1993, to September 21, 1993. The 121–day delinquency period was thereafter reinstated and collection efforts were pursued after the debtor received her discharge.

In sum, the debtor applied for and received twenty-nine months in unemployment deferment time; twenty-two months in temporary disability deferment time; and twenty-two months in forbearance time.[8] Clearly, the debtor was gainfully employed during some of the time that she was granted deferments. For example, she earned $10,167.00 from the Postal Service and Knoxville College during 1987 and $13,023.34 from Knoxville College, Pellissippi State, and the Postal Service during 1988. She applied for and received four unemployment deferments and two forbearance deferments during these two years. In 1992, she earned $22,199.96 from Knoxville College. During this time, she applied for and received one unemployment deferment and one forbearance deferment.

## II

The Bank argues that the debtor's student loan obligations are nondischargeable under § 523(a)(8), which provides in material part:

A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . .

(8) for an educational ... loan ... or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless—

. . . .

---

**8.** The court did not independently calculate this summary. The calculations are set forth in Exhibit 40, the authenticity of which is stipulated by the parties.

**(B)** excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents[.]

11 U.S.C.A. § 523(a)(8)(B) (West 1993). The debtor argues that the § 523(a)(8)(B) exception applies to her student loan obligations and, therefore, her indebtedness to First Tennessee Bank is dischargeable.

■ Courts have developed several tests in determining what constitutes an "undue hardship" under § 523(a)(8)(B). The Sixth Circuit recently discussed these tests, but failed to adopt any particular one because "the loans were dischargeable under any undue hardship test the [bankruptcy] court may have used in reaching its decision." *Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 359 (6th Cir.1994), *cert. denied*, —— U.S.——, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995). However, the Sixth Circuit determined that a finding of "undue hardship" can be based on three factors: (1) Whether the debtor is "capable of paying the loans while maintaining a minimal standard of living"; (2) Whether the debtor's "financial situation will improve in the foreseeable future"; and (3) Whether the debtor is acting "in good faith" or is "attempting to abuse the student loan system by having . . . [a] loan[ ] forgiven before embarking on [a] lucrative career[ ] in the private sector." *Id.* at 359–60. Based on these three factors, the Sixth Circuit agreed with the bankruptcy court's finding in *Cheesman* that the debtors' student loans were dischargeable.[9]

The three factors accepted by the Sixth Circuit were taken from tests adopted by other courts. One test requires a showing

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period . . .; and
(3) that the debtor has made good faith efforts to repay the loans.

*Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir.1987) (per curiam); *see Cheesman*, 25 F.3d at 359. Other tests cited in *Cheesman* focus on " 'whether there would be anything left from the debtor's estimated future income to enable the debtor to make some payment on his/her student loan without reducing what the debtor and his/her dependents need to maintain a minimal standard of living.' " *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir.1981) (quoting *Wegfehrt v. Ohio Student Loan Comm'n (In re Wegfehrt)*, 10 B.R. 826, 830 (Bankr.N.D.Ohio 1981)); *see Cheesman*, 25 F.3d at 359.

■ Notably, the Sixth Circuit in *Cheesman* accepted a finding of "undue hardship" based on the bankruptcy court's consideration of numerous factors, including that the debtors' gross income slightly exceeded the government's poverty income guideline. This is contrary to at least one court's threshold requirement that in order to prove the existence of an undue hardship the debtor's income must fall near the poverty line unless unique and extraordinary circumstances are established. *See Bryant v. Pennsylvania Higher Educ. Assistance Agency (In re Bryant)*, 72 B.R. 913, 915–16 (Bankr.E.D.Pa.1987). The Sixth Circuit also accepted a finding of undue hardship where the debtors had only made two $50.00 payments on each of their two loans which required a minimum payment of $68.00 and $54.00, respectively. *Cheesman*, 25 F.3d at 358. Some courts have held that a debtor may not claim an undue hardship unless there was some prepetition effort to begin repayment of or to renegotiate the loan. *See, e.g., Healey v. Massachusetts Higher Educ. (In re Healey)*, 161 B.R. · 389, 397 (E.D.Mich.1993). Whether an effort to begin repayment or renegotiate is now required in the Sixth Circuit is uncertain; however, under the authority of *Cheesman*, evidence of some payment can help in the determination that the debtor has acted in good faith.

---

**9.** The Sixth Circuit also accepted the bankruptcy court's eighteen-month stay of its order discharging the loans. The stay allowed the court to revisit the issue if the discharge became unwarranted because of an improvement in the debtors' financial situation.

The Bank argues that the debtor's educational loans are nondischargeable because she has not met the good faith requirement that exists in all "undue hardship" tests. According to the Bank, the debtor cannot satisfy the good faith requirement because she "failed to advise Bank of the change in her situations"; "earned income without paying anything against her debts"; "falsified information on her Deferment requests as to her unemployment or disability"; and "while claiming student loan disability, applied for and received unemployment compensation (pre- and post-bankruptcy) which required that she be able and willing to work, looking for work and not be under any disability." Defendant's Br. at 6–7.

Under the authority of *Cheesman* and the statutory language of § 523(a)(8)(B), the court cannot adopt a per se rule that a student loan is nondischargeable where the debtor has not acted in good faith at any time during the existence of the loan. The statutory language requires an "undue hardship," not good faith. Furthermore, the Sixth Circuit accepted the use of three factors in evaluating undue hardship and failed to discuss or adopt any per se rules. Accordingly, under the guidance of *Cheesman,* the court must consider all the facts and circumstances in this case to determine whether an "undue hardship" will be caused by excepting the debtor's educational loans from discharge.

## III

The court cannot find under the facts of the present case that the Bank's educational loans to the debtor should be discharged. First, the debtor's contention that she is unable to work is not supported by the record. While she has undoubtedly incurred medical expenses attributable to real or perceived illnesses, there is no proof, other than her own testimony, that she is unable to work. However, her testimony also belies this contention. The debtor testified that her doctors have encouraged her to work and that she has forwarded resumes to prospective employers for teaching, communications, and management positions. This suggests to the court that the debtor believes herself

capable of performing these jobs. When asked about her employment prospects, the debtor testified they were "very slim" but did not ground that belief on reasons related to health. Further, the court had the opportunity to observe the debtor during both direct and cross-examination and found her to be an intelligent and articulate witness. She did not appear to be intimidated in any way by the rigorous cross-examination of the Bank's attorney, Mr. McDonald, and gave no outward manifestation of the stress or emotional discomfort the court might have expected, given her testimony on direct examination. Finally, she has certified to the Tennessee Department of Unemployment Security that she is able and available for full-time work.

Second, the debtor has worked consistently since 1987 and it was only after she filed her bankruptcy petition that she began drawing substantial unemployment benefits and truly ceased working. She had two of her most productive years in 1992 and 1993 when she earned $22,199.96 and $18,526.64, respectively. Her entire earnings in 1992 and $13,916.64 of her 1993 earnings were attributable to the utilization of her teaching skills at Knoxville College. All of this occurred after the 1989 automobile accident to which she attributes the majority of her problems. The court has no proof that the debtor is any less capable of utilizing her teaching skills in the future than in the past.

Finally, the debtor has made no effort to commence payment of her obligations to the Bank. She obtained numerous unemployment, temporary disability, and forbearance deferments while she was, in fact, gainfully employed and utilizing the skills obtained from the masters degree financed by the student loans obtained from the Bank.

The Sixth Circuit has made the following observations about § 523(a)(8):

> The Bankruptcy Code was drafted to provide a discharge procedure that enables insolvent debtors the ability to reorder their affairs and enjoy "a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt." *Grogan v. Garner,* 498 U.S. 279 [286], 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local*

*Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). Congress elected to exclude certain obligations from the general policy of discharge based upon the conclusion that the public policy in issue, availability and solvency of educational loan programs for students, outweighs the debtor's need for a fresh start.

The legislative history of the 11 U.S.C. § 523(a)(8) teaches us that the exclusion of educational loans from the discharge provisions was designed to remedy an abuse by students who, immediately upon graduation, filed petition for bankruptcy and obtained a discharge of their educational loans. This was due to the fact that unlike commercial transactions where credit is extended based on the debtor's collateral, income, and credit rating, student loans are generally unsecured and based solely upon the belief that the student-debtor will have sufficient income to service the debt following graduation.

*Andrews Univ. v. Merchant (In re Merchant),* 958 F.2d 738, 740 (6th Cir.1992).

Admittedly, the court is not confronted with a debtor who is endeavoring to discharge educational loans immediately upon graduation. However, by her own actions, the debtor has obtained deferments over six years, thereby permitting her to avoid her repayment obligations to the Bank. When collection efforts by the Bank were finally commenced, the present bankruptcy case ensued. The debtor's schedules reflect that she has nonpriority unsecured claims totalling $30,117.27. Of this amount, $13,770.36, or approximately forty-seven percent (47%), is scheduled as debt for educational loans,[10] and $10,958.00, or approximately thirty-six percent (36%), represents her obligation to Dr. Burstein which the debtor testified she intends to repay.[11] Clearly, the debtor's in-terest in filing bankruptcy was to discharge her educational loans.

In sum, the debtor has not met her burden of proof with respect to the § 523(a)(8)(B) "undue hardship" issue and the court finds her obligations to the Bank to be nondischargeable.

## IV

The Bank asks the court to fix the attorney's fees and expenses to which it is entitled to reimbursement under the terms of its promissory notes to the date of trial. The Bank's attorneys, Goddard & Gamble, filed a statement (Exhibit 42) dated December 6, 1994, evidencing fees and expenses from January 27, 1994, through December 1, 1994, totalling $6,540.15, all of which are attributable to the Bank's participation in this adversary proceeding.[12] These fees, while seemingly high, are reasonable given the debtor's failure to cooperate in discovery and to otherwise participate in trial preparation until compelled to do so by the court.

On February 25, 1994, the Bank served the debtor with Interrogatories and a Request for Production of Documents. Thereafter, on April 12, 1994, upon failure of the debtor to comply with these discovery requests, the Bank filed a motion seeking to compel discovery. On May 10, 1994, subsequent to a hearing held May 5, 1994, the court entered an Order directing the debtor to fully and completely answer the Interrogatories propounded by the Bank and to produce for inspection and copying all requested documents by May 15, 1994. Other matters, including the Bank's request for sanctions, were reserved. On May 20, 1994, the Bank filed a Motion for Sanctions grounded upon the debtor's failure to comply with the May 10, 1994 Order, and requested entry of a default judgment. On May 31, 1994, subse-

---

10. In addition to the Bank's claim, scheduled at $8,233.40, the debtor also scheduled an educational loan owing Union Planters National Bank in the amount of $5,536.96.

11. *See supra* note 2.

12. At the conclusion of the trial, the court asked the debtor's attorney to review the statement and to file any objection within ten days. No objec-tion was filed, and the court presumes the debtor does not oppose the requested amount. Of the total, $512.40 is attributable to expenses, while the balance of $6,027.75 is for attorney's fees. Of this amount, $459.25, representing charges for services rendered on May 5, 18, and 25, 1994, was previously awarded the Bank as sanctions pursuant to the court's Order entered on June 27, 1994.

quent to a scheduling conference held by the court on May 25, 1994, an Order was entered setting the Bank's Motion for Sanctions for hearing on June 23, 1994, and directing the Bank's attorney, Mr. McDonald, to file an affidavit setting forth the attorney's fees and related expenses incurred by the Bank as a result of the debtor's failure to comply with discovery requests. Mr. McDonald filed an affidavit of expenses on June 2, 1994, and on June 17, 1994, filed a Motion for Default and Default Judgment. On June 22, 1994, the clerk entered a default against the debtor. On June 27, 1994, pursuant to a hearing held June 23, 1994, the court entered an Order directing the debtor to pay the Bank $459.25 for the expenses incurred in prosecuting its motions to compel discovery. Upon motion of the debtor filed June 27, 1994, the court, after a hearing held July 14, 1994, entered an Order on July 18, 1994, setting aside the default entered against the debtor. On August 25, 1994, the Bank filed another motion seeking to compel discovery for failure of the debtor to fully comply with its earlier request for production of documents. That motion was granted pursuant to an Order entered on September 27, 1994, which compelled the debtor, *inter alia*, to deliver the requested documents and to respond to a previously unanswered interrogatory.

The above recitation of the difficulties the court has had in bringing this case to trial is not exhaustive. The debtor's actions required numerous hearings and continuances, however, she never personally appeared before the court until the trial. At practically every hearing, the debtor's attorney explained that the debtor's lack of cooperation was due to her emotional and mental condition, but on no occasion was he able to produce any letter or other documentation from one of the debtor's physicians justifying or supporting her actions. The court is satisfied that the debtor's underlying intention has been to delay the trial of this adversary proceeding as long as possible. To some extent she has succeeded, just as she succeeded in obtaining payment deferments for over six years. However, her success has resulted in a considerable amount of accrued interest and attorney's fees. The Bank will be awarded the attorney's fees and expenses itemized in Goddard & Gamble's December 6, 1994 Statement, less the $459.25 previously awarded.[13]

This Memorandum constitutes findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. A judgment will be entered determining the debtor's educational loan obligations to the Bank to be nondischargeable. The attorney's fees and expenses to which the Bank is entitled to be reimbursed through December 1, 1994, will be fixed at $6,080.90.

### *JUDGMENT*

For the reasons set forth in the Memorandum filed this date containing findings of fact and conclusions of law as required by Fed. R.Bankr.P. 7052, it is ORDERED, ADJUDGED, and DECREED as follows:

1. The Complaint filed by the original Plaintiff, Ruby Helen Daugherty, on October 13, 1993, seeking a determination that two educational loans owing the original Defendant, First Tennessee Bank, are dischargeable under 11 U.S.C.A. § 523(a)(8)(B) (West 1993), is DISMISSED.

2. The Countercomplaint filed by the Counter–Plaintiff, First Tennessee Bank, seeking a determination that the two educational loans owed by the Counter–Defendant, Ruby Helen Daugherty, are nondischargeable pursuant to 11 U.S.C.A. § 523(a)(8) (West 1993), is SUSTAINED.

3. All sums now or hereafter owing the Counter–Plaintiff, First Tennessee Bank, by the Counter–Defendant, Ruby Helen Daugherty, under the terms of the two educational loans in dispute, amounting to $9,864.83, as of December 6, 1994, including principal, interest, and late charges, plus attorney's fees and expenses through December 1, 1994, totalling $6,080.90, are nondischargeable.

**13.** *See supra* note 12.