In re Wahid ELEBRASHY, Debtor.

Wahid ELEBRASHY, Plaintiff,

v.

STUDENT LOAN CORPORATION,
et al., Defendants.

Bankruptcy No. 91–13227.
Adv. No. 95–1427.

United States Bankruptcy Court,
N.D. Ohio.

Dec. 11, 1995.

924

Mary Ann Rabin, Rabin & Rabin Co., L.P.A., Cleveland, Ohio, for Debtor–Plaintiff.

Richard A. Baumgart, Dettelbach, Sicherman & Baumgart, L.P.A., Cleveland, Ohio, for Defendants.

## MEMORANDUM OPINION

DAVID F. SNOW, Bankruptcy Judge.

Debtor, Wahid Elebrashy, filed his chapter 13 petition on June 5, 1991. His plan was confirmed on August 21, 1991; he made timely payments under the plan and received his discharge on September 2, 1994. Elebrashy reopened his case on February 14, 1995 in order to file a complaint to determine dischargeability of two student loans aggregating nearly $80,000. He alleged that payment of these loans would impose an "undue hardship" on him under section 523(a)(8)(B) of the Bankruptcy Code. At the time he filed his complaint Elebrashy owed in excess of $35,000 plus interest to the United States on a loan he had obtained under the Health Education Assistance Loan Program (the "HEAL Loan") and owed approximately $42,000 plus interest to United Student Aid Funds, Inc. ("USAF") on a loan he had obtained under the Guaranteed Student Loan Program (the "GSL Loan").

The trial on September 21, 1995 involved only the GSL Loan and whether its repayment would impose an undue hardship on Elebrashy. Prior to the trial, Elebrashy had conceded that 42 U.S.C. section 292f(g) prevented discharge of the HEAL Loan whether or not repayment of that loan would impose an undue hardship. On October 4, 1995, the Court entered a consent judgment fixing the amount owed on the HEAL Loan at $37,807.93 plus interest from March 17, 1995. On October 11, 1995, the parties advised the Court that Elebrashy had agreed to repay the HEAL Loan at the rate of $200 per month. It will take Elebrashy nearly 40 years to pay the HEAL Loan, assuming an annual interest rate of 5.62 percent, the current rate under 28 U.S.C. section 1961.

### I. Background

Elebrashy is a native of Egypt who intended to become a medical doctor. He attended medical school in Egypt but moved to the United States before completing his final year. He applied for admission to medical schools in this country but was unsuccessful. He completed his education and received an M.D. degree from CETEC University Medical School in the Dominican Republic in December 1981. Despite passing the equivalency exam for foreign medical students, Elebrashy was unable to secure a residency at a hospital in the United States so as to obtain a license to practice medicine in this country.

After unsuccessfully pursuing his goal of becoming a medical doctor for several years, Elebrashy decided to become a podiatrist and enrolled at the New York College of Podiatric Medicine ("NYCPM") in 1984. He withdrew from NYCPM after it appeared that he would not receive credit for his prior school work despite the fact that he had been admitted as a second year student. To pursue his goal of becoming a podiatrist, Elebrashy moved to Cleveland in 1987 to attend the Ohio College of Podiatric Medicine ("OCPM"). His work at NYCPM and OCPM was financed by loans received under the HEAL and GSL programs.

Although his wife had moved with him to Cleveland, they were separated in 1988 and divorced in 1991. During that period Elebrashy suffered an episode of acute depression and was diagnosed as suffering from bipolar disease. The onset of this disease appears to have been precipitated by his need to repeat classes he had already taken in New York, a failed marriage, and mounting debt from his education. He has been hospitalized at least twice for this condition and must take medication for the rest of his life to control it. Because of his medical and personal problems, Elebrashy requested a leave of absence from OCPM in 1988. His request was denied and he was dismissed from the school.

After being dismissed from OCPM, Elebrashy concluded that he could not afford to continue his goal of becoming a podiatrist but would need to find a job, and he secured a temporary position as an unlicensed physician's assistant with a Cleveland doctor. Because he was not licensed as a physician's assistant and could not afford to pursue this

license, he was dismissed when the doctor was able to hire a licensed assistant. Shortly thereafter, Elebrashy was hired by the Cuyahoga County Sheriff as a medical assistant, a position he has now held for approximately 6 years. His duties include taking medical histories, assisting in the dispensary, maintaining medical records, and performing physical exams under the supervision of a licensed physician.

Elebrashy remarried in 1993. His wife, a 30–year old Egyptian national, moved to the United States in September, 1995. She is in the country on a conditional residency permit and is seeking permanent residency. Although she is healthy, her English skills are poor and she is currently unemployed.

## II. Discussion

Section 1328 of the Bankruptcy Code states that:

(a) ... the court shall grant the debtor a discharge of all debts provided for by the plan or disallowed under section 502 of this title, except any debt—

.      .      .      .      .

(2) of the kind specified in paragraph (5), (8), or (9) of section 523(a) ... of this title.

11 U.S.C. § 1328(a)(2).

Section 523(a) provides that a discharge does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

.      .      .      .      .

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

11 U.S.C. § 523(a)(8)(B)

■ Section 523(a)(8)(B) embodies Congress' determination that the repayment of educational loans is in general more impor-

tant than providing debtors a fresh start. *Andrews University v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6th Cir.1992). This general rule gives way, however, where repayment would impose an undue hardship on the debtor and the debtor's dependents. "Undue hardship" is not defined by the Bankruptcy Code or its legislative history. Undue means "exceeding or violating propriety or fitness." *Webster's New World Dictionary of the American Language* (2d College Edition 1986). Hardship is defined as "hard circumstances ... a thing hard to bear as poverty or pain, etc." *Id.* Not surprisingly, courts have concluded that "garden-variety" difficulty or "unpleasantness" does not qualify as "undue hardship" and is an insufficient excuse for discharge of student loans. *Healey v. Mass. Higher Educ. (In re Healey)*, 161 B.R. 389 (E.D.Mich.1993). Even so, the concept of undue hardship remains amorphous, and courts have attempted to develop specific tests to distinguish ordinary hardship from undue hardship. The court in *Penn. Higher Educ. Assistance Agency v. Johnson (In re Johnson)*, 5 Bankr.Ct.Dec. (CRR) 532 (Bankr.E.D.Pa. 1979), created a three-part test which has been widely followed. A slightly modified version of the *Johnson* test was adopted by the Second Circuit in *Brunner v. New York State Higher Education Services Corp. (In re Brunner)*, 831 F.2d 395, 396 (2d Cir.1987) (per curiam). Both the *Johnson* and *Brunner* tests examine the debtor's present circumstances, prospects for the future, and good faith. The primary difference between the two is that *Brunner* does not consider whether the debtor benefitted from the education financed by the loan. *Matter of Roberson*, 999 F.2d 1132 (7th Cir.1993) (expressly adopting *Brunner* and criticizing *Johnson* for requiring an inquiry into the benefit from the education).

■ Although the Sixth Circuit has not expressly adopted the *Brunner* test, the Court recently applied the *Brunner* factors with apparent approval in *Cheesman v. Tenn. Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 359 (6th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 731, 130 L.Ed.2d 634 (1995). The *Brunner* test has also been widely employed in recent lower court decisions in this Circuit: *Cobb v. Univ.*

*of Toledo (In re Cobb )*, 188 B.R. 22 (Bankr. N.D.Ohio 1995); *McLeod v. Diversified Collection Services (In re McLeod )*, 176 B.R. 455 (Bankr.N.D.Ohio 1994); *Daugherty v. First Tenn. Bank (In re Daugherty )*, 175 B.R. 953 (Bankr.E.D.Tenn.1994); *Healey v. Mass. Higher Educ. (In re Healey )*, 161 B.R. 389 (E.D.Mich.1993); and elsewhere: *Ammirati v. Nellie Mae, Inc. (In re Ammirati )*, 187 B.R. 902 (D.S.C.1995); *Hawkins v. Buena Vista College (In re Hawkins )*, 187 B.R. 294 (N.D.Iowa 1995); *Commonwealth of Va. State Educ. Assistance Auth. v. Dillon*, 189 B.R. 382 (W.D.Va.1995); *Walcott v. USA Funds, Inc. (In re Walcott )*, 185 B.R. 721 (Bankr.E.D.N.C.1995); *Garrett v. N.H. Higher Educ. Assistance Foundation (In re Garrett )*, 180 B.R. 358 (Bankr.D.N.H.1995); *Stebbins–Hopf v. Tex. Guaranteed Student Loan Corp. (In re Stebbins–Hopf )*, 176 B.R. 784 (Bankr.W.D.Tex.1994); *Lynn v. Diversified Collection Serv. (In re Lynn )*, 168 B.R. 693 (Bankr.D.Ariz.1994); *Kraft v. N.Y. State Higher Educ. Serv. Corp. (In re Kraft )*, 161 B.R. 82 (Bankr.W.D.N.Y.1993); *Ipsen v. Higher Educ. Assistance Found. (In re Ipsen )*, 149 B.R. 583, 585 (Bankr.W.D.Mo. 1992); *Cadle Co. v. Webb (In re Webb)*, 132 B.R. 199, 201 (Bankr.M.D.Fla.1991). In order for a student loan to be discharged under section 523(a)(8)(B), the *Brunner* test requires a showing (1) that the debtor cannot maintain a minimal standard of living based on current income and expenses if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the loans; and (3) that the debtor has made a good faith effort to repay the loan. *Brunner*, 831 F.2d at 396.

### A. Minimal Standard of Living

As noted above, the first prong of the *Brunner* test requires the debtor to show that he cannot maintain a minimal standard of living for himself and his dependents based on current income and expenses if forced to repay the loans. *Brunner*, 831 F.2d at 396. In order to make this determination, the court compares the debtor's current income with his current expenses. This test, which the Seventh Circuit described as

being "dictated by common sense," has routinely been applied by courts as the "bare minimum to assert a claim of undue hardship." *Roberson*, 999 F.2d at 1135. It serves as a starting point for a section 523(a)(8)(B) inquiry since information regarding the debtor's current financial situation is usually concrete and readily available. *Id.*

Elebrashy earns $11.91 per hour and receives 26 biweekly paychecks. His gross earnings for each four-week period are about $1,905. His take-home pay for each four-week period is about $1,120 after his employer deducts from his paycheck for taxes, social security, medicare, health insurance, parking costs, and $100 paid biweekly to Elebrashy's credit union account. On a monthly basis, his take-home pay after deductions is about $1,213. Elebrashy's budget, dated May 18, 1995, shows expenses of $1,325. A copy of the budget is attached as Appendix A.

USAF did not challenge Elebrashy's proof that, taken as a whole, his expenditures reflect a minimal standard of living for him and his wife. In fact, most of his budgeted expenditures on their face are low—probably unrealistically low for two people over the long term. Rent is $390 per month; utilities are minimal; nothing is budgeted for newspapers, entertainment, or education, except a $35 monthly cable television charge. There is nothing reserved for the unforeseen expenses that become a near certainty over a period of years except a $35 miscellaneous charge, which is earmarked for car expenses or repairs and holiday expenses, and the credit union payments. However, two budget items do appear to provide Elebrashy some additional flexibility: the $500 per month budgeted for food and household expenses and the $100 per month budgeted for phone expense. USAF questioned both items.

The budget was submitted while Elebrashy's wife was in Egypt. Now that she is here, the phone expense will be reduced. The $500 food and household item included $100 which Elebrashy sent to help support his wife while she was in Egypt. Although Elebrashy testified that these savings would be offset by his wife's expenses now that she

is living with him in Cleveland, $500 still appears high for this item. Based on the evidence as a whole, it appears that the phone and food and household items overstate these expenses and can be reduced by about $100 a month. The only other source for money to fund payments to USAF appears to be the $100 which Elebrashy's employer pays biweekly into his credit union account, which amounts to $217 monthly. But, $112 of this amount is already required to bridge the gap between his monthly take home pay of $1,213 and his monthly expenses of $1,325, leaving only about $100 unaccounted for. This leaves in all about $200 per month which might be squeezed from his budget to fund student loan payments.

Elebrashy's monthly expenses must now be increased by $200 per month, apparently for the next 40 years, for payments on the HEAL Loan. This payment will probably absorb any surplus from his budget and eliminate any reserve for unforseen expenses. In fact, based on the evidence at trial, the HEAL Loan payment appears supportable only on the assumption that Elebrashy's wife will in due course contribute to the family's expenses. Although the Court is unaware of the factors reflected in the parties' agreement to make a $200 monthly payment on the HEAL Loan, the United States had the right to require payment in full of the HEAL Loan as soon as possible and was under no legal constraint to leave any surplus for USAF or for Elebrashy.

■ It appears from the record that the GSL Loan was to be amortized over 20 years at a floating rate that the parties agreed at the time of trial was approximately 10 percent. This would require monthly payments of about $400 for the next 20 years. Undue hardship must be viewed from the perspective of the duration of the hardship as well as its severity during any portion of the repayment period. Even if Elebrashy could squeeze enough from his living expenses for a year or two to pay something on the GSL Loan, committing him to that enterprise over the next 20 years would amount to an insupportable sentence of impoverishment and hopelessness unless, of course, his circum-

stances improve substantially and unforeseeably.

## B. Future Prospects

■ The second prong of the *Brunner* test requires the debtor to show that the circumstances that preclude payments on the student loan are likely to persist for a significant portion of the loan repayment period. *Brunner*, 831 F.2d at 396. If those circumstances are transitory, and the debtor's situation will likely improve, requiring repayment of the loan will not impose an undue hardship. This prong of the test recognizes that the borrower's education should, in most cases, provide increased income that will allow the loan to be repaid, even though immediately after graduation a student borrower's assets may be dwarfed by the size of the loan. *Roberson*, 999 F.2d at 1135–36. Requiring the debtor to prove that his inability to pay will endure reflects the judgment that bankruptcy should not provide a means by which "frustrating and burdensome student loan payments" may be eliminated simply because steady employment is not forthcoming soon after a student completes his or her education. *Id.* at 1136. "Requiring evidence *not only* of current inability to pay but *also* of additional, exceptional circumstances, strongly suggestive of continuing inability to repay over an extended period of time, more reliably guarantees that the hardship presented is 'undue.' " *Id.* (quoting *Brunner*, 831 F.2d at 396). A debtor cannot meet the requirements of this inquiry if pursuing a line of work different from the one he has chosen would allow him to pay off the loans. *Kraft*, 161 B.R. at 85; *Healey*, 161 B.R. at 395; *N.D. State Board of Higher Educ. v. Frech (In re Frech)*, 62 B.R. 235, 241 (Bankr. D.Minn.1986).

■ In this case, the evidence indicates that Elebrashy's present circumstances are likely to persist for the foreseeable future. He has no apparent prospect for advancement or significant pay increase from his employer. Although he did perform some overtime work in 1994, he did no overtime work in 1995 and he does not expect overtime work to be available in the foreseeable future because of Cuyahoga County's current

budget problems and the continuing squeeze on governmental spending. From the evidence it appears that Elebrashy will be fortunate if future pay increases keep up with inflation.

Nothing in the evidence indicates that Elebrashy could improve his employment situation by seeking a position other than the one he currently holds, whether in medicine or any other field. Elebrashy's uncontradicted testimony was that his position with the Sheriff's Department was the best job he could find without being licensed as a medical assistant. To be licensed as a medical assistant, Elebrashy would need to attend school full-time for another two years, which appears impractical. The only possibility for Elebrashy to materially increase his income would be through a second job, if one were available. There is no evidence that he could find additional work or perform it without aggravating his medical condition. He appears fortunate that his current employer understands his condition and has taken steps to accommodate him. To require him to work a second job for the next 20 years to pay the GSL Loan would be more than undue hardship; it would, under his circumstances, be an invitation to disaster.

USAF argues that Elebrashy's wife should contribute to the family's future income. Although she was trained as a teacher in Egypt, it appears doubtful that she can obtain significant employment unless and until her English skills improve. Her employment prospects are, therefore, uncertain, although it appears that she will have to work if the couple is to exist at more than a subsistence level or if they have children. At this point, it is entirely speculative that she will be able to generate income over and above amounts required, after related expenses such as possible child care, to provide the family a minimal standard of living. Moreover, in an environment where about one-half of marriages end in divorce, there is no assurance that her earnings will be available to pay Elebrashy's loan in the future. She is not obligated on the loan. To mortgage her future earnings to repayment of the loan rather than to an improvement in her standard of living would not only be unfair but would provide a powerful motivation for her to abandon the marriage.

### C. Good Faith

█ The final inquiry under *Brunner* is whether the debtor made a good faith effort to repay the loan. *Brunner*, 831 F.2d at 396. This prong of the test reflects the fact that a student who receives government-guaranteed educational loans "assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." *Roberson*, 999 F.2d at 1136 (citation omitted). This test encompasses the notion that a "debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'" *Id.* (citations omitted). Courts have found a lack of good faith in a variety of circumstances. *See e.g., Perkins v. Vermont Student Assistance Corp.*, 11 B.R. 160, 161 (Bankr.D.Vt.1980) (buying a new car was a self-imposed hardship); *Conner v. Ill. State Scholarship Comm'n (In re Conner )*, 89 B.R. 744, 749 (Bankr.N.D.Ill.1989) (debtor imposed hardship on herself by sending her children to private colleges rather than less expensive state schools); *Daugherty*, 175 B.R. at 960 (debtor's intent to avoid student loans was clear from the fact that she intended to repay $10,000 in other loans); *Bakkum v. Great Lakes Higher Educ. Corp. (In re Bakkum )*, 139 B.R. 680, 683 (Bankr.N.D.Ohio 1992) (debtor sharply increased food and rent expenses postpetition and reaffirmed two other loans while attempting to discharge student loans); *McLeod*, 176 B.R. at 458 (lack of good faith when debtor failed to negotiate payments before seeking discharge); *Healey* 161 B.R. at 397 (same); *In re Kraft*, 161 B.R. at 86–87 (petition filed "too soon" after completing education).

█ None of these factors is present in this case. Elebrashy did not file his petition immediately upon completion of his education. Although he did not make payments on the loans before filing his petition, such a failure to pay will not result in a finding of lack of good faith where the debtor has no funds to make any repayment. *Hawkins*, 187 B.R. at 299; *Conner*, 89 B.R. at 749 n.

18; *Courtney v. Gainer Bank* (*In re Courtney*), 79 B.R. 1004, 1011 (Bankr.N.D.Ind. 1987). Given the magnitude of the student loan debt, the paucity of Elebrashy's income, and the apparent hopelessness for future improvement of his situation, the fact that he made no payments on his student loans until after he had consulted an experienced bankruptcy attorney is not an indication of bad faith. The cases that have discussed this issue have been liquidations under chapter 7 where the debtor sought to wipe out the student loan without making any repayment effort. Here Elebrashy made payments on his student loans for three years through his chapter 13 plan.

■ USAF points to several other factors which it argues show that Elebrashy lacks good faith in seeking discharge of this loan. USAF would have the Court find bad faith in Elebrashy's answer to an interrogatory that asked him for his gross monthly salary. Elebrashy answered that his salary was $1,094 per month. Although this figure misstates Elebrashy's gross income, it is about the same as his take-home pay of $1,120 every two pay periods as reflected in his pay statements. Moreover, Elebrashy gave his correct hourly income in answering the same interrogatory. Therefore it appears that he may have confused take-home pay with gross income. An intent to mislead is not consistent with providing the correct hourly rate from which his current gross income can be simply computed.

■ USAF argues that Elebrashy showed bad faith by misstatements in the income statement filed with his original chapter 13 plan. Although Elebrashy could not at trial reconcile his subsequent tax statements with his income as shown in his chapter 13 schedules, the evidence did not establish that Elebrashy understated his income in 1991 with the intention of lowering his plan payments. The fact that Elebrashy was confused by figures in four-year-old schedules is not surprising, especially since USAF had not previously put statements in Elebrashy's chapter 13 schedules in issue in this proceeding. Moreover, USAF's predecessor, Chase Manhattan, was a named creditor in the chapter 13 case. The time to have raised questions as to whether that case was filed in good faith was at its inception. Elebrashy's chapter 13 plan was confirmed on August 21, 1991. Section 1330(a) limits any revocation of a confirmed plan to 180 days after the order of confirmation is entered. This 180-day period has long passed and USAF cannot now attack the terms of the confirmed plan.

■ USAF would also have the Court find a lack of good faith in Elebrashy's answer to an interrogatory that asked whether Elebrashy or his spouse suffered "from any physical or mental disability or impairment." Elebrashy answered "none" to this interrogatory despite the fact that he has bipolar disease. When questioned as to why he answered the question in the negative, Elebrashy explained that he was ashamed of disclosing his condition and using it as an excuse for his inability to repay his loans. This explanation is credible and there appears to be no intent to mislead since his condition was elsewhere disclosed. In any event, his answer is probably technically correct. It appears from the evidence that with proper medication his condition is not disabling and does not impair his work performance.

■ USAF also argues that Elebrashy's failure to qualify as a medical doctor or podiatrist was due to his own negligence or neglect, that he might in fact have qualified for a residency in a United States hospital, and that he could and should have completed his podiatry degree. There is, however, nothing in the record to support a holding that Elebrashy failed to pursue his goals of becoming a medical doctor or podiatrist sincerely. At most, USAF's cross-examination indicated that, with other or additional actions, Elebrashy might have achieved these goals. But this is at best speculation and, even if true, in no way impugns Elebrashy's good faith in contracting his student loans or in attempting to qualify for careers that would have enabled him to pay them in full. USAF's argument amounts to an indictment of Elebrashy for incompetence which, if true, would merely reinforce the judgment that he may be unable to improve his circumstances in the future.

### III. Conclusion

After considering the evidence presented, the Court finds that Elebrashy has established that repayment of the student loan to USAF would work an undue hardship on Elebrashy and his dependents within the meaning of 11 U.S.C. section 523(a)(8)(B) and that this loan should therefore be discharged.

Appendix A - Budget Submitted May 18, 1995

MAY 18 1995     5/16/95

DEAR MIS/ RABIN

ENCLOSED PLEASE FIND A COPY OF THE LATEST PAY,
STUB AS YOU REQUESTED.

THE FOLLOWING ARE THE MONTHLY EXPENCES THAT,
COVER ME AND MY WIFE

                         no

[1] RENT — — — — — — — — — — — — — 390

[2] FOOD & HOUSE HOLD GOODS — — — — — — 500

[3] GAS — — — — — — — — — — 50

[4] TEL — — — — — — — — — — — 100

[5] ELC — — — — — — — — — — — 40

[6] CABL T.V. — — — — — — — — — 35

[7] CAR INSURANCE — — — — — — — 75

[8] MEDICATION (suffering from chronic illness) — 50

[9] CLOTHS & unifoms. — 600/YEAR — — 50

[10] MECELANIOUS (INCLUDING CAR MENTENACE & REPAR. — 35
             ( HOLIDAYS EXPNS )

                               1325

WAHID EL-EBRASHY    THANK YOU.   EXHIBIT 4