**In re Kenneth J. SALINAS and Jane Ann Manning, Debtors.**

**Kenneth J. Salinas, Plaintiff,**

**v.**

**United Student Aid Funds, Inc., Defendant.**

**Bankruptcy No. 98–53293–7.
Adversary No. A98–5159–7.**

United States Bankruptcy Court,
W.D. Wisconsin.

Feb. 14, 2001.

914

Terrence J. Byrne, Byrne, Goyke, Tillisch & Higgins, S.C., Wausau, WI, for plaintiff.

Jeffrey O. Davis, Kevin M. Long, Quarles & Brady LLP, Milwaukee, WI, for defendant.

### MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

This matter is before the Court on remand from the district court. On September 15, 1999, this Court entered an order determining that the debtor's obligations to the defendant, United Student Aid Funds, Inc., constituted an "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8) and were therefore dischargeable.[1] The defendant appealed, and on December 10, 1999, the district court reversed and remanded the case, ostensibly to determine whether "a deferred or reduced payment would cause [the debtor] undue hardship."

The Court conducted a scheduling conference with the parties, and the matter was delayed for a period of time because the debtor was unemployed. Ultimately, a subsequent hearing on the dischargeability of this debt as an undue hardship was held on November 15, 2000. At that hearing, the debtor renewed his request that the debt be entirely discharged. The essential facts are as follows. At the time of the original hearing, the debtor worked for Marathon Communications in Wausau. He earned approximately $31,000.00 per year. His total monthly income, including net take home pay and support payments from his former spouse, totaled $2,531.36. His amended Schedule J listed expenses of approximately $3,500.00 per month. During the pendency of the appeal, Marathon Communications was apparently acquired by another entity and the debtor's position was eliminated. He was unemployed for several months.

As of November 15, 2000, the debtor had obtained employment at AFLAC, an insurance company. He receives a monthly draw of $2,000.00 against future commissions. Through the date of trial, he had earned relatively little by way of commission and actually owed AFLAC approximately $10,000.00 for his monthly draws. He hopes to establish a customer base that will permit him to repay this debt and provide him with annual compensation of approximately $30,000.00 within "a couple of years." However, he also admitted that the company has a number of other agents in the Wausau area and that he has had some difficulty obtaining the necessary business.

The debtor also provided the Court with a list of the companies he contacted during his job search, together with a number of rejection letters. During the first trial on this matter, the debtor introduced the testimony of Dennis Goodwin, a labor market analyst with the Department of Workforce Development. The Court agreed with Mr. Goodwin that given Mr. Salinas' age (at that time he was 41) and background, he was unlikely to obtain a position outside of the sales representative field. Mr. Salinas is now two years older and has in fact regressed in terms of earning power. In this regard, it must be remembered that the debtor did not complete the advanced degree which generated much of his stu-

---

**1.** This Court's earlier decision is published as *Salinas v. United Student Aid Funds, Inc. (In re Salinas)*, 240 B.R. 305 (Bankr.W.D.Wis. 1999) (hereafter referred to as *"Salinas I"*).

dent loan debt.[2] As a result, he cannot work directly in that field. He has, however, attempted to utilize his medical background by pursuing jobs in related fields (for example, he sought employment as a pharmaceutical sales representative). He has not been successful in finding such employment.

The debtor's financial obligations remain very similar to those presented at the time of the first trial. He has custody of his son and is obligated to pay daycare expenses. His schedules reflect the obligation to pay approximately $750.00 per month on his nondischargeable HEAL loans. He is required to maintain his own vehicle for work purposes. As many business contacts are to be found at community events, he finds it necessary to spend a certain amount of money on what in many instances would otherwise be categorized as "recreation" or social events. It appears that they are a necessary extension of his professional life. Even if certain items were trimmed from his budget, there is simply no room left for payment of these loans unless he surrenders some of the basic necessities of life—for example, food, clothing, or shelter.

■ This brings the Court squarely to the issue presented by many debtors like Mr. Salinas. The bankruptcy code provides that student loans are dischargeable if the debtor can demonstrate that repayment would constitute an "undue hardship" upon him or his dependents. In Mr. Salinas' case, it is true that he is not destitute. He is not physically or mentally disabled. But a reasonable forecast of his earning potential suggests that he will not be able to meet all of his other financial obligations, let alone the debt owed to the defendant in this case. When there is no

evidence to support the argument that the debtor can actually repay the loans, this Court believes that it is fair to consider the debts to be an "undue hardship" within the meaning of 11 U.S.C. § 523(a)(8). The undue hardship examination should have as its essential starting point one simple question: Is there a reasonable prospect that the debtor will ever be able to repay these loans? This is an examination best left to the sound discretion of the trier of fact, as it is the trial court that is in the best position to judge the debtor's veracity and prospects. It is this Court's belief that under any analysis, the debtor in this case is economically incapable of repaying these debts. The failure to discharge these obligations would therefore be a misinterpretation of § 523(a)(8) and would stand in derogation of the "fresh start" policy of the bankruptcy code.

The exception to discharge for student loans has a long and checkered history. As this Court discussed in great detail in the course of its earlier decision, Congress initially designed § 523(a)(8) to preclude successful graduate students from discharging the debts that permitted them to attain their advanced degrees.[3] The goal was not to prevent all students from obtaining the "fresh start" that bankruptcy promises. However, over the years, judicial decisions have narrowed the interpretation of "undue hardship" to the point that many courts rely upon mechanical tests or rules rather than examine each debtor on his or her own merit. For example, some courts rely upon the presence of physical or mental disabilities or an income that falls below the government's poverty guidelines. *See, e.g., Holmes v. Sallie Mae Servicing Ctr. (In re Holmes)*, 205 B.R. 336 (Bankr.M.D.Fla.1997); *Griffin v. Eduserv (In re Griffin)*, 197 B.R. 144

2. The debtor attended the Illinois College of Optometry from 1989 to 1992. He did not graduate because his grades fell below acceptable levels. At the time of the first trial, he owed approximately $68,694.49 in Health Education Assistance Loans ("HEAL" loans). He also owed some $84,650.00 to the defen-

dant. The debtor concedes the HEAL loans are nondischargeable. However, he testified at the second hearing that given his income situation, he has been unable to make the required payments.

3. *See Salinas I*, at 310–12. .

(Bankr.E.D.Okla.1996). While these are justifiable considerations, adhering to a "bright line" test does not sufficiently deal with the wide variety of debtors seeking to have their debts discharged.

The simple fact is that § 523(a)(8) does not mandate that the debtors fall below governmental poverty guidelines before their debts can be discharged. As the court stated in *Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305 (3d Cir.1995), the code does not require that the debtor "live in abject poverty ... before a student loan may be discharged." The court's obligation is to determine the amount "minimally necessary" to ensure that the debtor's needs for care, including food, shelter, clothing, and medical treatment are met. *Rice v. United States (In re Rice)*, 78 F.3d 1144, 1149 (6th Cir.1996). In this regard, the Court is bound by the Seventh Circuit's decision in *Matter of Roberson*, 999 F.2d 1132 (7th Cir.1993), a decision which like *Faish* adopted the so-called *"Brunner* test" to determine the dischargeability of student loan debt. Under this test, the debtor must demonstrate:

1. That the debtor cannot maintain, based on current income and expenses, a "minimal standard of living for [himself] and [his] dependents if forced to repay the loans."

2. That additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans.

3. That the debtor has made good faith efforts to repay the loans.

*Roberson*, 999 F.2d at 1135; *see also Brunner v. New York State Higher Educ. Services Corp.*, 831 F.2d 395 (2d Cir.1987).[4]

As the *Faish* court recognized, the *Roberson* decision did not require showing of economic futility by the debtor. Rather, it focused on the debtor's ability to pay the debts. This is reflected in the fact that a minimal standard of living requires "more than a showing of tight finances." *Stein v. Bank of New England, N.A. (In re Stein)*, 218 B.R. 281, 287 (Bankr. D.Conn.1998). If the debtor has done everything he can to minimize expenses and maximize income, there is no basis for refusing to discharge the student loans. *Ammirati v. Nellie Mae, Inc. (In re Ammirati)*, 187 B.R. 902, 907 (D.S.C.1995). In the end, what the court must do is examine the debtor's current income and expenses and determine a "flexible minimal standard of living" which is sensitive to the particular circumstances of each case through the application of common sense. *Stein*, 218 B.R. at 287.

For purposes of this case, perhaps the most crucial aspect of the *Roberson* decision is its tacit sanction of the notion that a bankruptcy court could "defer" repayment on student loans to some date in the future, at which time the debtor's financial circumstances could be reconsidered. 999 F.2d at 1138. A number of courts have also held that the code permits judicial modification or restructuring of the underlying debt. While the Seventh Circuit did not address this issue in *Roberson*, the district court's remand order clearly contemplates that such an inquiry should be made in this case. As such, the Court must first consider the basis for such a dramatic reworking of the bankruptcy code. In truth, the sole basis for either

4. This Court's reservations about the *Roberson* decision were outlined in the earlier decision in this case. *See Salinas I*, 240 B.R. at 312–13. Suffice it to say that it is often difficult to shoehorn debtors into the rigid structure of *any* test. For example, there is often debate about the type of "additional circumstances" that the *Brunner* test requires. This Court agrees that the crucial inquiry is whether there is something that prohibits or restricts the debtor's ability to earn sufficient income to repay the loan. It should not be limited to an examination of the debtor's physical or mental condition. *See Barrows v. Illinois Student Assistance Comm'n (In re Barrows)*, 182 B.R. 640, 649 (Bankr.D.N.H.1994) (court is most concerned with the debtor's future employability).

deferments or partial discharges is found not in § 523(a)(8), but rather in 11 U.S.C. § 105(a), which provides that the court may "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." *See Cheesman v. Tennessee Student Assistance Corp. (In re Cheesman)*, 25 F.3d 356, 360 (6th Cir.1994).

■■■ This Court respectfully disagrees. As the Supreme Court stated in *Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 112 S.Ct. 1146, 117 L.Ed.2d 391, 397–98 (1992):

> [C]anons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. [citation omitted]. When the words of a statute are unambiguous, then, this first canon is also the last: "judicial inquiry is complete." [citation omitted].

The language of § 523(a)(8) is simple and unambiguous. The debtor is entitled to a discharge of his student loan debt only if he demonstrates that repayment would constitute an "undue hardship." Nothing in the statutory language even remotely suggests that Congress wanted the bankruptcy courts to delay making this determination, or serve as loan workout specialists by restructuring the debt. If such had been Congress' intent, certainly some suggestion of this authority would be found in the code. For example, other sections of § 523(a) provide exceptions to discharge "to the extent" that debts meet certain criteria. Had Congress included that phrase in § 523(a)(8), partial discharges and deferments would at least have some statutory justification. To authorize partial discharges is tantamount to judicial legislation and is something that should be left to Congress, not the courts. *See Unit-*

*ed Student Aid Funds v. Taylor (In re Taylor)*, 223 B.R. 747, 753 (9th Cir. BAP 1998); *Skaggs v. Great Lakes Higher Educ. Corp. (In re Skaggs)*, 196 B.R. 865 (Bankr.W.D.Okla.1996).

■■■ While § 105(a) provides the bankruptcy courts with broad, equitable powers, they are not without limitations. The section does not authorize relief which is "inconsistent" with more specific laws. *In re Rohnert Park Auto Parts, Inc.*, 113 B.R. 610 (9th Cir. BAP 1990). More importantly, the bankruptcy courts should not exercise these equitable powers to create additional property rights or remedies in favor of a debtor or other party in interest *unless those rights or remedies are statutorily authorized under the bankruptcy code*. *In re Vota*, 165 B.R. 92 (Bankr.D.R.I.1994); *Matter of Schewe*, 94 B.R. 938 (Bankr.W.D.Mich.1989). Any grant of authority given to the bankruptcy courts under § 105(a) "must be exercised within the confines of the bankruptcy code." *Gouveia v. Tazbir*, 37 F.3d 295 (7th Cir.1994). And ultimately, this section is not a "roving commission for [the] court to do equity." *In re WAPI, Inc.*, 171 B.R. 130 (Bankr.N.D.Ala.1994).

To interpret § 523(a)(8) as requiring the bankruptcy court to consider deferrals or debt restructuring is to expand the rights and remedies available under the bankruptcy code. It is, in truth, a judicial effort to rewrite the statute Congress authored. Despite strong misgivings about this form of judicial activism, this Court recognizes that the directive contained in the district court's remand order constitutes the "law of the case." Accordingly, it is the Court's challenge to determine whether a "deferred or reduced payment" would cause Mr. Salinas undue hardship.

As a preliminary matter, the Court notes that the initial trial in this case was held in the summer of 1999. The Court's original order discharging the student loans was entered in September of 1999. Due to the debtor's unemployment and

discussions between the parties, the second trial was not held until November 15, 2000. As a result, the debtor received a "de facto" deferral of his student loans for approximately one year. Under the clear language of the *Roberson* decision, a debtor who receives a deferral of his debt can request that the court subsequently reexamine his financial condition *in its entirety*. As the Seventh Circuit stated, "If, upon the expiration of that deferment ... [the debtor's] financial condition has not improved as anticipated, he may file a motion requesting the bankruptcy court reopen his case." 999 F.2d at 1138. From this Court's perspective, the delay satisfies the mandate that the Court consider either a deferral or a partial discharge. The debtor obtained a de facto deferral. As contemplated by the *Roberson* court, he is now asking that the Court reconsider his financial plight and discharge his debt.

 The Court therefore turns to an examination of his current financial situation to determine whether the loans constitute an "undue hardship" within the context of the *Roberson* decision. Although he evidenced a measure of optimism at the November 15, 2000, hearing, it is clear from the record that the debtor's situation is deteriorating. He was unemployed for a number of months. The only employment he managed to obtain was with AFLAC, and his salary is based upon draws against future commissions. To date, he has not managed to generate sufficient commissions to justify even the draws he has received, and he now owes the company some $10,000.00. It is his "hope" that he will manage to generate sufficient commissions over the next couple of years to repay this debt and attain an annual salary of approximately $30,000.00. That salary is not sufficient to satisfy his current expenses and make the sizeable payments that would be required to retire these student loans. Further, at his age, it does not appear that a significant career change or boost in earning potential is particularly likely.

The debtor's expenses continue to exceed his income. As a commissioned salesperson, he is obligated to participate in community and social events in order to meet prospective clients. He is obligated to pay some $750.00 a month for his non-dischargeable HEAL loans. He has custody of his minor son.[5] The expenses listed by the debtor for the essentials of life—food, clothing, and shelter—gobble up virtually all of his disposable income. He is barely making ends meet. In fact, since the time of the first hearing, he has incurred additional debts, including approximately $1,500.00 in credit card debts, because he does not have sufficient income to purchase such items as clothes for work.

 This Court recognizes that the notion of "undue hardship" means that student loans are not discharged simply because repayment may cause some "major personal and financial sacrifices." *Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 306 (3d Cir.1995). Current financial adversity, characteristic of all debtors in bankruptcy, is not determinative. *Wardlow v. Great Lakes Higher Educ. Corp. (In re Wardlow)*, 167 B.R. 148, 151–52 (Bankr. W.D.Mo.1993). As *Roberson* directs, there must be some "additional circumstances" that indicate the inability to pay will persist for the foreseeable future. Some courts would suggest that the code re-

---

5. There was some speculation as to the debtor's "good faith" in failing to pursue maintenance from his ex-wife during their divorce proceedings. During the November 15, 2000, hearing, the debtor's divorce attorney testified that he did not believe it was likely the debtor would have received maintenance for several reasons, including the length of the marriage and other allegations made by the ex-wife.

The debtor chose to forego the maintenance claim in order to facilitate the divorce process and eliminate at least one aspect of what was apparently a bitter and rancorous proceeding. This does not constitute a lack of good faith or a failure to maximize income. It was simply a decision not to pursue a costly and possibly unfruitful course of action.

quires the debtor to demonstrate a "certainty of hopelessness." *See Barrows*, 182 B.R. at 648. However, this Court is not among them. It is the feasibility of repayment, not the absolute certainty of financial destitution, that is the key determination. *Roberson*, 999 F.2d at 1135 (court must focus on whether lack of financial ability is "likely" to continue into the foreseeable future).

The debtor has documented his efforts to find employment. He was unemployed for a number of months before starting work with AFLAC. He now receives a monthly "draw" of $2,000.00. When augmented by child support and other items, his monthly income totals $2,740.00. Clearly, his income might rise since it is largely based upon commissions derived from insurance sales. However, he had been employed by AFLAC for almost six months at the time of the November 15, 2000, hearing and had not earned *any* significant amount in commissions. In fact, he owed AFLAC nearly $10,000.00 for the draws he had already received. His testimony was that other AFLAC representatives in the area indicated he could anticipate an annual income of about $30,000.00 after "a couple of years." When taken in conjunction with the fact that he is obligated to repay AFLAC for prior draws, it is unclear how he will make any significant income over that amount during the course of the next several years. Further, given the apparent level of competition among agents in the Wausau market, the debtor has found it difficult to obtain customers. While that may change, it is unlikely to result in a dramatic modification of his income projections. In fact, it simply has to change for him to even *meet* his desired goal of $30,000.00 a year, let alone exceed it.

The prior testimony of Dennis Goodwin indicates that the debtor's employment history makes him most likely to find a job in the sales/marketing area. He has attempted to exploit his medical background by pursuing employment as a pharmaceutical representative, as well as other related jobs. He has been unsuccessful in these attempts. He found a job with AFLAC. It is clearly not the job he would have liked, but it offers him an income and some measure of support for his minor son. While he could seek employment elsewhere, he believes he may owe AFLAC for his draws against future commissions even if he leaves the company. At this point, the Court cannot condemn the debtor for any particular lack of effort. He has attempted to maximize his income. Unfortunately, the amount of income at his disposal has only decreased in the past year. Nothing suggests that it will dramatically increase at any time in the future.

Similarly, the debtor's expenses are not lavish. He owns a home, but rent would not be significantly lower than his mortgage payment. His monthly obligations exceed his income by nearly $900.00. This shortfall means that he still cannot make payments on his HEAL loans, and that a number of expenses are paid by credit card. He testified that he has incurred at least $1,500.00 in new credit card expenses since the first hearing in this case. He cannot afford to pay for work clothes or other necessities out of his current income. Quite simply, the debtor has a frugal lifestyle and lives paycheck to paycheck. *See Windland v. United States Dep't of Educ. (In re Windland)*, 201 B.R. 178, 182 (Bankr.N.D.Ohio 1996). Based on this second review of his income and expenses, the Court has no other choice but to again conclude that he has made every effort to "minimize expenses and maximize income." *Ammirati*, 187 B.R. at 907. He is still unable to pay his current obligations, let alone these student loans. Repayment of the student loans would mean that the debtor would be unable to maintain a minimal standard of living. *Roberson*, 999 F.2d at 1135. There is nothing left once the debtor allocates funds for food, shelter, clothing, and medical treatment. *Rice*, 78

F.3d at 1149. Therefore, he has satisfied the first prong of the *Roberson* test.

The debtor has also demonstrated the existence of "additional circumstances" within the meaning of *Roberson*. The Seventh Circuit did not dictate that only handicapped debtors could receive a discharge of their student loans. Rather, this prong of the test "imputes to the meaning of 'undue hardship' a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period." 999 F.2d at 1135. He has a minor son. He is 43 years old. He has no particular prospects of increasing his earning power significantly beyond the $30,000.00 per year he mentioned in his testimony. He has not been able to make payments on the $68,694.49 in HEAL loans he does not ask to have discharged. Even if the debtor could squeeze enough from his living expenses to pay a few dollars on the loans at issue in this case, "committing him to that enterprise over the next 20 years would amount to an insupportable sentence of impoverishment and hopelessness unless, of course, his circumstances improve substantially and unforeseeably." *Elebrashy v. Student Loan Corp. (In re Elebrashy)*, 189 B.R. 922, 927 (Bankr.N.D.Ohio 1995). The Court foresees no such improvement.

The final aspect of the *Roberson* test is that of "good faith." Quite simply, the debtor must have made a good faith effort to repay his loans. As the Seventh Circuit stated, "With the receipt of a government-guaranteed education, the student assumes an obligation to make a good faith effort to repay those loans, as measured by his or her efforts to obtain employment, maximize income, and minimize expenses." 999 F.2d at 1136. This does not mean that the debtor must have made payments to the creditor. Rather, "a failure to pay will not result in a finding of lack of good faith where the debtor has no funds to make any repayment." *Elebrashy*, 189 B.R. at 928; *see also Coats v. New Jersey Higher Educ. Assistance Auth. (In re Coats)*, 214 B.R. 397 (Bankr.

N.D.Okla.1997); *Sands v. United Student Aid Funds (In re Sands)*, 166 B.R. 299 (Bankr.W.D.Mich.1994).

In this case, when the debtor ceased attending optometry school in 1992, he was still married. He supported his wife as she completed her studies. Since their divorce, his efforts at finding gainful employment have been mixed at best. He sought deferrals of the student loan obligations while he attempted to improve his financial condition. He has not been successful. The Court will not penalize him when his failure to make payments results from circumstances beyond his control. *See Roberson*, 999 F.2d at 1136 (the debtor's condition must arise from factors beyond his "reasonable control"). The debtor's financial condition is not the result of some willful or negligent activity on his part. His grades were not satisfactory. He could not continue his education. He attempted to find employment and took the jobs which were available to him. He has acted in good faith in striving to provide a sufficient livelihood for himself and his son. He simply cannot repay the loans.

Accordingly, upon studying the evidence and testimony presented after the deferral of this matter, the Court concludes that the debtor has satisfied his burden under 11 U.S.C. § 523(a)(8). He has met all three parts of the *Roberson* test. As a result, there is no basis for considering an additional deferral or partial discharge. *See Roberson*, 999 F.2d at 1137–38 (deferral of debt appropriate where "the debtor's dire straits are only temporary"). The student loan obligations owed to the defendant are discharged as constituting an "undue hardship" within the meaning of the bankruptcy code.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.