In re Rae Rice PERRY, Debtor.

Rae Rice Perry, Plaintiff,

v.

Student Loan Guarantee Foundation of Arkansas, Defendant.

Bankruptcy No. 97–60823.
Adversary No. 98–6035.

United States Bankruptcy Court,
W.D. Arkansas,
Hot Springs Division.

Aug. 16, 1999.

Rae Rice Perry, Arkadelphia, AR, pro se.

Connie Meskimen, Hot Springs, AR, for defendant SLGFA.

Frederick Wetzel, Little Rock, AR, trustee.

## MEMORANDUM OPINION

ROBERT F. FUSSELL, Bankruptcy Judge.

### I. BACKGROUND

Pending before the Court is Rae Rice Perry's ("Plaintiff," "Debtor," or "Perry") Complaint to determine the dischargeability of student loan debt pursuant to 11 U.S.C. §§ 523(a)(8)(A)[1] and (B)[2]. The Complaint concerns a debt owed by Perry to the Student Loan Guarantee Foundation of Arkansas ("SLGFA") based upon a promissory note executed by Perry on May 21, 1990. The debt is also evidenced by an Order of Summary Judgment granted in favor of SLGFA and against Perry by the Clark County, Arkansas Circuit Court on February 17, 1995.

The Debtor filed her Chapter 7 petition on September 19, 1997. An Order of Discharge was entered on January 30, 1998, and the Debtor's case was closed on February 27, 1998. The Debtor filed the above-styled adversary proceeding on August 27, 1998.[3] On September 3, 1998, she filed a Motion to Reopen her bankruptcy case for a determination on the dischargeability of the student loan debt. Her Motion to Reopen was granted via an Order filed October 27, 1998. The Court held hearings in the adversary proceeding on April 20 and June 16, 1999.

### II. JURISDICTION

This Court has subject matter jurisdiction over the above adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157. The proceeding is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(I). The following are findings of fact and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### III. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO SECTION 523(a)(8)(A)

#### A. Findings of Fact

The Court held a hearing regarding the dischargeability issues raised under 11 U.S.C. § 523(a)(8)(A), the seven-year issue, on June 16, 1999. The Court received the following exhibits into evidence at that hearing:

*SLGFA Exhibit No. 1*

Composite Exhibit

A. Interim Note signed by Perry and dated September 1, 1983, in the amount of Two Thousand Five Hundred Dollars ($2,500). The Interim Note is stamped "Paid";

B. Interim Note signed by Perry and dated January 9, 1984 in the amount of Two Thousand Five Hundred Dollars ($2,500). The Interim Note is stamped "Paid";

C. Promissory Note signed by Perry and dated September 15, 1984, in the amount of Two Thousand Five

---

1. Section 523(a)(8)(A) of the Bankruptcy Code, as it is applicable to the present proceeding, provides that a debt for an educational benefit loan made or guaranteed by the government is nondischargeable unless:
   (A) such loan, benefit, scholarship, or stipend ... first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition.
   11 U.S.C. § 523(a)(8)(A).

2. Section 523(a)(8)(B) of the Bankruptcy Code, as it is applicable to the present proceeding, provides that a debt for an educational benefit loan made or guaranteed by the government is nondischargeable unless:
   (B) excepting such debt from discharge ... will impose undue hardship on the debtor and the debtor's dependents.
   11 U.S.C. § 523(a)(8)(B).

3. Plaintiff filed her adversary proceeding on August 27, 1998, before Congress repealed Section 523(a)(8)(A) by amendment on October 7, 1998. Accordingly, the Section 8(A) claim must be, and it is, decided here.

Hundred Dollars ($2,500). The Promissory Note is stamped "Paid";

D. Promissory Note signed by Perry and dated January 1, 1985, in the amount of Two Thousand Five Hundred Dollars ($2,500). The Promissory Note is stamped "Paid";

E. Promissory Note signed by Perry and dated September 5, 1985, in the amount of Two Thousand Five Hundred Dollars ($2,500). The Promissory Note is stamped "Paid";

F. Promissory Note signed by Perry and dated January 5, 1986, in the amount of Two Thousand Five Hundred Dollars ($2,500). The Promissory Note is stamped "Paid";

G. Promissory Note signed by Perry and dated July 18, 1986, in the amount of Two Thousand Five Hundred Dollars ($2,500). The Promissory Note is stamped "Paid".

*SLGFA Exhibit No. 2*

Application/Promissory Note signed by Perry and dated April 10, 1990, in the amount of Twenty Thousand Four Hundred Seventy–One Dollars and Five Cents ($20,471.05). The Application/Promissory Note lists "seven disbursements 4/83–9/86" as "to be consolidated" and contains the following pertinent language:

To Sallie Mae: By means of this application, I am applying to have my loans consolidated into a SMART LOAN Account at Sallie Mae.... If Sallie Mae accepts this application, it is my understanding Sallie Mae will advance funds on my behalf to creditors who currently hold eligible loans named above which I herein select for consolidation in my SMART LOAN Account. The funds advanced by Sallie Mae will be disbursed to the holders of the loans designated above in order to pay off those loans.

*SLGFA Exhibit No. 3*

Composite Exhibit

A. Request for Forbearance dated January 8, 1991, for period beginning November 21, 1990 and ending May 21, 1991;

B. Request for Forbearance dated July 24, 1991, for period beginning June 21, 1991 and ending December 21, 1991;

C. Request for Forbearance dated February 25, 1992, for period beginning January 21, 1992 and ending July 21, 1992;

D. Request for Forbearance dated September 22, 1992, for period beginning July 22, 1992 and ending January 21, 1993.

*SLGFA Exhibit No. 4*

Loan Payoff Inquiry dated June 10, 1999, showing payment history and balance due of $42,868.62.

*SLGFA Exhibit No. 5*

The Debtor's Bankruptcy Schedules.

*Plaintiff's Exhibit No. 1*

SLGFA Deferment Eligibility Chart.

The Debtor testified that she signed each of the promissory notes introduced into evidence as Exhibit 1, and that she received seven disbursements, one from each of the notes. The Debtor testified that she applied for the SMART LOAN on April 10, 1990, but did not understand at that time that all of the notes listed in Exhibit 1 were "merged into" the SMART LOAN. The Debtor testified that she received a lower interest rate on the SMART LOAN than she had been required to pay under the other notes, and that the loan proceeds were used to pay off the previous notes. The Debtor received no additional monies or consideration for the SMART LOAN.

The first payment under the SMART LOAN was due May 21, 1990. The Debtor testified that each of the four forbearances she requested was granted. Each was six months in duration, for a period totaling

twenty-four months. The forbearance period began November 21, 1990, and ended January 21, 1993, during which time, the Debtor was not required to make and did not make any payments. The Debtor filed her Chapter 7 petition on September 19, 1997.

### B. *Conclusions of Law*

■ Section 523(a)(8)(A) provides for discharge of student loans funded by a government unit if the date the loan first became due is more than seven years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the bankruptcy petition. In the instant case, the Debtor asserts that the loans at issue first became due more than seven years before the bankruptcy case, notwithstanding the note consolidation and forebearance periods. The undisputed evidence before this Court is that the Debtor signed the note for the debt that is at issue in this case on April 10, 1990. The fact that there may have been earlier notes that were paid off with the proceeds of the new note does not alter this result. *See In re Stricklen*, 224 B.R. 905, 906 (Bankr. E.D.Ark.1998).

■ The debt at issue in the present case is evidenced by the April 10, 1990 note, the SMART LOAN note, and not any earlier notes. The record reflects that the first payment under that note was due on May 21, 1990. Had there been no "applicable suspension of the repayment period," as set forth in § 523(a)(8)(A), the first payment under that note would have become due more than seven years prior to September 19, 1997, which is the date of the filing of the petition. In that case, the debt would have been dischargeable. However, SLGFA maintains and this Court agrees that the four six-month forebearance periods granted Perry constitute an "applicable suspension of the repayment period" that must be considered in determining whether the payment first became due more than seven years from the date of the filing of the petition.

Other courts have reached similar conclusions based on similar facts. In *Georgina v. Higher Education Assistance Foundation (In re Georgina)*, 124 B.R. 562 (Bankr.W.D.Mo.1991), for example, the Chapter 7 debtor brought an adversary proceeding seeking a determination that his student loans were dischargeable. After considering the legislative history of the statute, the court determined that nine forbearances the debtor had been granted, for a total of fifty-three months during the eighty-nine months transpiring between the first payment due date and the bankruptcy filing date, constituted applicable suspensions of the repayment period.

In *Saburah v. United States Department of Education (In re Saburah)*, 136 B.R. 246 (Bankr.C.D.Ca.1992), a Chapter 7 debtor brought an adversary proceeding to obtain discharge of consolidated student loan debt. The debtor had consolidated four preceding promissory notes and subsequently applied for a five-month forbearance on the consolidated note. The debtor was given a six-month forbearance. The court held that the statutory seven-year period began to run on due date of consolidated loan the debtor sought to discharge, and the debtor's six-month forbearance would be excluded from the statutory seven-year period as an applicable suspension of the repayment period. *Id.* at 253–54. Other courts which have addressed comparable issues have reached the same conclusion. *See In re Shryock*, 102 B.R. 217 (Bankr.D.Kan.1989) (informal agreement between the parties that the debtor would pay only interest for a period of time constituted a "suspension of the repayment period"); *Eckles v. Wisconsin Higher Education Corp. (In re Eckles)*, 52 B.R. 433 (E.D.Wis.1985) (forbearance agreement between the parties which called for a reduction in the amount of payments for a three-month period constituted an "applicable suspension of the repayment period").

In her pre-trial brief and citing *In re Keenan*, 53 B.R. 913 (Bankr.D.Conn.1985),

the Debtor asserts that the forbearance periods she was granted do not constitute an "applicable suspension of the repayment period" because the forbearance request forms were sent to her, unsolicited, by the creditor. The Debtor also asserts that "[a]ccording to SLGFA's own published Deferment Eligibility Chart, borrowers with Federal Consolidated Loans prior to July 1, 1993, are not eligible for deferment based upon economic hardship." Thus, she maintains, SLGFA should be estopped from asserting that the forbearance periods she was granted were applicable or authorized by regulation to suspend the repayment period of her student loan.

The Debtor's reliance on *Keenan* is misplaced. In *Keenan*, the court held that a first deferment of the debtor's student loan payments on the basis of debtor's unemployment was invalid under existing regulations, where the regulations allowed deferments not for unemployment but only for periods during which the debtor was serving in the armed forces or the Peace Corps. The court found that a second deferment of payments based on the debtor's letter stating that she was unemployed but was seeking full-time employment was also improper, where the debtor did not state that she had been unemployed during the period as to which second deferment was granted and did not request an extension of her loan. The forbearance was nevertheless imposed unilaterally by the creditor. The court determined that for purposes of section 523(a)(8)(A), neither deferment suspended the time between the date the student loan first became due and filing of bankruptcy petition.

*Keenan's* persuasive power is reduced by the contrasts with the facts of this case. First, although SLGFA's Deferment Eligibility Chart referred to in the Debtor's brief was offered and received into evidence at the hearing in this matter, the Debtor called no witnesses to testify regarding the relevance or applicability of

the chart to the facts of her case, or the basis for the deferment eligibility requirements listed thereon. Thus, the document is hardly persuasive. Second, even if the forebearance request forms were sent to the Debtor unsolicited, she chose to complete the forms and request the forebearance. Unlike *Keenan*, the forbearance was not imposed upon the Debtor unilaterally by the creditor.

Based upon the foregoing, this Court concludes that the four six-month forbearance periods constitute suspension(s) of the repayment period. Doing the math, this Court finds that, exclusive of the forbearance suspension of the repayment period that was twenty-four months in duration, the first payment under the consolidated note became due less than seven years prior to the filing of the bankruptcy petition. Put another way, the period between the first due date under the consolidated note, May 21, 1990, and the date of the filing of the petition, September 19, 1997, is approximately eighty-eight months, i.e., seven years and four months. The forbearance period was approximately twenty-four months, i.e., two years. Exclusive of the forbearance period of two years, the debt first became due sixty-four months, i.e., five years and four months, prior to the date of the petition. Accordingly, the Court concludes the debt is nondischargeable.

## IV. FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO SECTION 523(a)(8)(B)

### A. Findings of Fact

The Debtor is fifty-three years old, married, and has a daughter who is twenty years old. She obtained her Bachelor of Arts in modern foreign languages from Arkansas A & M College. She then obtained a Master of Science in education from Ouachita Baptist University. She was a school teacher and taught French and English until 1974.[4] She then became

4. Plaintiff testified that she had been certified to teach but that she was no longer; neverthe-

interested in the law when she worked with a Little Rock law firm in connection with voting rights legislation and in the fall of 1983 she enrolled in law school. She drove back in forth from Arkadelphia to Little Rock to go to law school. She obtained the student loans in issue while in law school.

She graduated from law school in 1986. After graduating, she served on the State Board of Education. She participated in compiling a publication on education reform, and worked as a desegregation assistant and field consultant. She did all this work and was not paid. It was voluntary community service on her part.

In 1989 she passed the bar exam and was licensed to practice law. Another attorney was winding down his law practice in Arkadelphia and she undertook his practice. She paid him a small fee for his equipment. She testified that her law practice clientele consisted of indigents and poor working-class people. Approximately sixty-five percent of her clients were minorities. Her indigent and working class clientele paid her no fees because they could not afford to do so. Sometimes her clients would pay her on the barter system. She testified that she had just too many indigent people to take care of.

After obtaining her law license in 1989, the Governor of the State of Arkansas asked her to serve on the State Board of Education as a Board Member. She accepted this position without pay, except for a small appearance fee for board meetings. She was also reimbursed for travel expenses to and from board meetings. She spent a great deal of time working to better education in the State of Arkansas. She was the only minority member of the board.

She stated that between the time spent on State Board of Education and her law practice she became worn out.[5] In 1993 she could no longer afford a secretary and downtown law office, so she had to let the secretary go and move her law practice into her home. She continued to practice law out of her living room with what little equipment she had. She stated that she considered her law practice and service of the State Board of Education as public service which should be taken into consideration in satisfying her student loans. She further testified that she has not had a phone for over a year.[6]

The debtor filed her schedules on October 3, 1997. Her schedules reflect the following: real property $50,000.00; personal property $20,335.00; secured claims $31,865.32; unsecured priority claims –0–; and unsecured nonpriority claims of $38,-861.72. The debtor's secured claims reflect that she owns a 1995 Dodge auto with a balance owing of $12,000.00 and a fair market value of $11,000.00. The schedules further reflect a computer with a balance owing of $665.32 and a fair market value of $1,000.00; a copier which is leased and a balance owing on the lease of $3,700.00 and a value of $3,500.00. Further, the debtor and her husband own a house with a mortgage of $15,500.00 and the fair market value is reflected as $50,000.00. The debtor's unsecured claims are listed as student loans of $38,373.75; AT & T $129.22; medical services $69.60; a revolving account of $222.07; and another revolving account of $67.08.

The debtor's Schedule "I" reflects that she is self-employed and has a net income of $700.00 per month. Her husband is employed by the Arkadelphia Human Development Center and net monthly income

---

less, she had been able to teach these languages without certification, having filled the term of another teacher in the past. Plaintiff further testified that she taught fourth-grade Spanish.

**5.** Debtor resigned from the Board in February of 1996.

**6.** Perry's Amended Schedules filed April 12, 1999 reflect in the monthly statement of expenses telephone $300.00 per month.

is $2,081.72. Their combined net monthly income is $2,781,72.

The debtor's Schedule "J" reflects the following monthly expenses, for combined monthly expenditures of $2,813.76:

| | | |
|---|---|---:|
| Rent or home mortgage payment | | $302.26 |
| Utilities: Electricity and heating | | |
| | fuel | 150.00 |
| | Water and sewer | 46.00 |
| | Telephone | 280.00 |
| | Cable | 33.00 |
| Home maintenance | | 30.00 |
| Food | | 300.00 |
| Clothing | | 75.00 |
| Laundry and dry cleaning | | 40.00 |
| Medical and dental expenses | | 125.00 |
| Transportation | | 150.00 |
| Recreation | | 40.00 |
| Charitable contributions | | 100.00 |
| Insurance (auto) | | 75.00 |
| Taxes (personal property) | | 3.50 |
| Installment payments (auto) | | 377.00 |
| Daughter's college expenses | | 427.00 |
| Office supplies and equipment | | 260.00 |

Debtor's Statement of Income and Expenses, filed April 12, 1999, reflects the following: Monthly income of $500.00 and $2,344.91 from her spouse, for a total of $2,844.91. Expenses are as follows, for combined monthly expenditures asserted to be $2,955.50: [7]

| | | |
|---|---|---:|
| Rent | | $302.00 |
| Utilities: Electricity and heating | | |
| | fuel | 150.00 |
| | Water and sewer | 60.00 |
| | Telephone | 300.00 |
| | Cable | 36.00 |
| Home maintenance | | 50.00 |
| Food | | 300.00 |
| Clothing | | 25.00 |
| Laundry and dry cleaning | | 20.00 |
| Medical and dental expenses | | 100.00 |
| Transportation | | 100.00 |
| Recreation | | 5.50 |
| Charitable contributions | | 100.00 |
| Insurance (auto) | | 75.00 |
| Taxes (personal property) | | 3.50 |
| Installment payments (auto) | | 377.00 |
| Daughter's college expenses | | 240.00 |
| Office supplies and equipment | | 40.00 |

As of April 20, 1999, Plaintiff testified that her health was "generally good," although she was "under observation." [8] She further testified that she lived with her husband of twenty-one years, Hank Perry II, but that she had filed for divorce on March 22, 1999; the pair still shared the same house, however. Mr. Perry is employed as a program manager with the Arkadelphia Human Development Center and, in 1998, earned an adjusted gross income of $29,312.00. (Plaintiff's Exhibit 14). The Perrys have a twenty-year-old daughter Amber, who is in her second year on scholarship at Hendrix College.

Plaintiff acknowledged that she has never voluntarily paid anything back to SLGFA on her student loan debt. As of April 20, 1999, [9] SLGFA records showed that the original note was $20,471.05, with a total payoff of $42,553.79 (including interest and costs).

### B. Conclusions of Law

Section 523 of the Bankruptcy Code, 11 U.S.C. § 523(a)(8)(B), provides that student loans issued or guaranteed by the government are nondischargeable unless:

(B) excepting such debt from discharge ... will impose undue hardship on the debtor and the debtor's dependents.

The standard of proof is by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Once a creditor establishes that the loan in question is a student loan generally nondischargeable in a Chapter 7 case, the burden of proof shifts to the debtor to show nondischargeability on grounds of undue hardship. *In re Woodcock*, 45 F.3d 363 (10th Cir.1995). Once the debtor makes a credible showing that undue hardship exists, the burden of production shifts to the creditor to present some evidence to rebut the debtor's case. If the trier of fact remains in doubt as to a fact after the burden of production shifts

---

7. This sum appears to be an arithmetical error; the figures supplied add up to $2,284.00 instead.

8. She did not expand on this point, neither in testimony nor in evidence.

9. Testimony of William Scales, Student Loan Guarantee Foundation keeper of records, April 20, 1999 hearing; Defendant's Exhibit 3.

to the creditor, then the creditor has failed to satisfy its burden and the trier of fact must find that undue hardship exists. *O'Brien v. Household Bank (In re O'Brien)*, 165 B.R. 456 (Bankr.W.D.Mo. 1994).

■ "Undue hardship" is not defined in the Bankruptcy Code. From numerous court-made interpretations of this provision, the Bankruptcy Appellate Panel for the Eighth Circuit Court of Appeals has recently crafted a "totality of the circumstances" test that is binding on this Court.[10] The analysis assesses: (1) the debtor's past, present, and reasonably reliable future financial resources; (2) the debtor's and his or her dependents' reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding the particular bankruptcy case.[11] *Andresen v. Nebraska Student Loan Program, Inc.*, 232 B.R. 127, 139 (8th Cir. BAP 1999).

*1. Debtor's current and future financial resources.*

■ Debtor's Schedule I showed her monthly net income of $700.00 [12] and her husband's as $2,081.72. Her 1998 tax return, filed jointly with her husband, indicates a $3,516.00 loss from her business, showing a combined adjusted gross income of $29,312.00. (Plaintiff's Exhibit 14.) [13] Plaintiff testified that her financial return was so low because her clientele was largely unable to pay her for her services.

10. After reviewing the numerous alternatives available, the *Andresen* court noted that the test it announced was "not as finely detailed" as some, 232 B.R. at 139, but allowed "a broader consideration of the case and any factors specific to a given debtor's particular situation." *Id.* at 140.

11. A subsequent court has chosen to characterize this prong of the test as "other unique circumstances in [the] particular case." *Williams v. Missouri Southern State College (In re Williams)*, 233 B.R. 423 (Bankr. W.D.Mo.1999).

12. Plaintiff testified at the April 20 hearing that her income was $500.00.

There can be no doubt that Plaintiff is a candid, intelligent, articulate person. She testified that her health is "generally good." [14] Further, in addition to her pre-law Masters degree in languages and her prior teaching experience, she has attained her considerable skills as an attorney by virtue of the very loans at issue in this case. The pleadings she drafted were carefully and accurately researched and cogently written and argued. She represented herself throughout the pendency of this adversary proceeding and at the April 20 hearing. Even in spite of the considerable demand on her emotions in so doing, she did a very capable job.

It would seem, therefore, that the only impediment to Plaintiff's earning from these skills a substantial income in the past, and into the future, is her desire to serve a class of clients who cannot pay her.

The Court must reluctantly conclude that this cannot be grounds on which to premise a finding of undue hardship. Plaintiff's character and commitment to social issues is unquestionably sincere; the Court finds laudable her desire to serve. However, Plaintiff has elected to take on any hardship here as a matter of personal choice. Despite the self-evident sincerity and importance of Plaintiff's choice, it is not a choice that the code blesses by providing an exception to nondischargeability.

Moreover, the Court surmises that the marketplace must be full of those who

13. At the April 20 hearing, Plaintiff asserted that she filed for divorce but that she and her husband were still living together. In light of the complete absence of any other proof to establish the divorce, however, and given the testimony about this couple's somewhat ambiguous living situation, the Court will consider the income of both Plaintiff and her husband as contributing to Plaintiff's support.

14. She did add that she was "under observation." However, without further evidence having been proffered on this point, the Court is unable to consider it.

might not be doing the jobs they would most prefer, but who nevertheless labor for many years to pay back the student loans that made their employment a reality. As the District Court stated in *Healey v. Massachusetts Higher Education (In re Healey)*, 161 B.R. 389, 395 (E.D.Mich. 1993):

> [H]ow many [graduates] will find that, at times, the employment which would be most satisfying personally must be abandoned, delayed or augmented if the financial rewards that are available are not sufficient to allow them to meet their financial obligations? The experience of life teaches us that, other than the privileged few, all encounter intervals in which they cannot do precisely what they desire because it simply does not pay enough money. A resolute determination to work in one's field of dreams, no matter how little it pays, cannot be the fundamental standard from which "undue hardship" under § 523(a)(8)(B) is measured.

Thus, the *Healey* court ruled plaintiff's debt nondischargeable, when she declined to find higher-paid employment solely because she wanted to continue teaching, which she "loved." Similarly decided cases include *Palanca v. Texas Guaranteed Student Loan Corp. (In re Palanca)*, 219 B.R. 502 (Bankr.N.D.Ill.1998) (attorney denied discharge of student loans; no physical or mental disability and low income attributable only to desire to practice law solo and not in better-paying firm); *O'Flaherty v. Nellie Mae, Inc. (In re O'Flaherty)*, 204 B.R. 793, 797–98 (Bankr. N.D.Ala.1997) (discharge denied despite court's sympathizing with debtor's "compelling" testimony on his "unfortunate failure to realize lifetime goal" of ordination as priest); *Mathews v. Higher Education Assistance Foundation (In re Mathews)*, 166 B.R. 940, 946 (Bankr.D.Kan.1994) (debtor had earned more in the past than she did after receiving art degree but still failing to seek other jobs that could generate more income); *In re Woodcock*, 149 B.R. 957 (Bankr.D.Colo.1993) (healthy debtor with law and master's degrees not entitled to hardship discharge as he appeared able to obtain and retain employment at good rate of pay).

Similarly, it would be most unfair for this Court to afford this Plaintiff an exception to the rule that so many others toil so long and hard to honor, absent any authority from Congress. None such exists.

Further, this Court need merely note the stark contrast between the facts of this case and those of others, post-*Andresen*, in which the courts of this judicial circuit have found hardship. Despite prospects far poorer than this Plaintiff's, one of the debtors was still required to pay back at least some of her loans in *Williams v. Missouri State College (In re Williams)*, 233 B.R. 423 (Bankr.W.D.Mo.1999). This debtor tried to carry a full-time student load while also working a late-night shift at a convenience store, delivering newspapers, *and* fulfilling her responsibilities as a wife and mother to five adolescent children, one of whom had become pregnant and another one of whom, an adopted ward, was disabled. Not surprisingly, this debtor had to drop out of school and take a full-time job as an unskilled laborer or machine operator in a paint gun factory. The court found her prospects for improvement negligible, yet, even on those facts, it granted her a partial discharge only.

Under similarly trying circumstances, the debtor received a hardship discharge in *Brown v. USA Group Loan Services (In re Brown)*, 234 B.R. 104 (Bankr.W.D.Mo. 1999). This debtor had two small children when she started school and a third was born subsequently (all to different fathers). Her husband abandoned her and all of the fathers preferred to quit their jobs rather than have their wages garnished to fulfill their child support obligations. Accordingly, despite this debtor having obtained a bachelor's degree in business administration and having applied without success for numerous jobs, even despite posting her

resume on the Internet, she was obliged to take a job as a secretary for a state agency. There she had no prospects for promotion and was eligible for only minimal raises, which depended on state appropriations. Even so, she had made some attempts to repay her loan before taking shelter in bankruptcy. The Court judged her prospects for financial improvement "unlikely," of "limited latitude," or "totally unrealistic," and discharged her student-loan debt on hardship grounds.

In contrast, the Plaintiff in the case at bar has no minors to support.[15] Further, based on her handling of her own case before this Court, she appears to be a most capable attorney, yet she offered no evidence of even trying to find employment that would pay her better. Her financial difficulties thus stem solely from her abiding commitment to provide community and humanitarian services to a low- or no-paying population. Over the course of the thirteen years since Plaintiff graduated from law school, she has taken this route as a matter of choice, not necessity. The Court must regretfully find that the code simply furnishes no grounds to find these circumstances as the basis for dischargeability.

### 2. Debtor's necessary reasonable living expenses.

For the reasons stated immediately below, the Court finds that Plaintiff has failed to sustain her burden to show undue hardship as to a monthly telephone bill of either $280.00 or $300.00, and as to her daughter's college expenses of $427.00 or

---

**15.** The Court will address this question in more detail, *infra*.

**16.** The latter two alternative figures were the amounts to which Plaintiff testified at the April 20th hearing.

**17.** The *Towery* court cited with approval a Florida decision holding that "[w]hile most parents willingly assist their adult children in obtaining a higher education that is increasingly necessary in today's fast-changing world, any duty to do so is a moral rather than a legal one." *Towery*, 685 S.W.2d at

---

$240.00.[16] Accordingly, these funds should be available for Plaintiff to pay back her loans.

As to the telephone bill, Plaintiff offered no explanation of why it was so high, stating only that it was due to her husband's use. Elsewhere in the hearing, she asserted that she did not use the telephone or the Internet for her law business. Her husband is a state employee, presumably able to use the telephone for all work-related needs at his place of employment. Thus, in the absence of any explanation for such an unusually high bill, the Court finds it excessive.

As to Plaintiff's claiming $427.00 or $240.00 a month to support her twenty-year-old daughter in college, this cannot be deemed the basis for a finding of hardship either. Plaintiff has no legal duty to assume this responsibility. These facts are to be contrasted with those in *Williams*, 233 B.R. at 430, (duty found to support seventeen-year-old handicapped ward, whom biological mother abandoned into debtors' care, premised on disability and prior undertaking to care for child notwithstanding disability).

In Arkansas, the age of majority is eighteen. Ark.Code Ann. § 9–25–101 (Michie 1999). The general rule is that once a child reaches majority and is physically and mentally healthy, the legal duty of the parents to support that child ceases. *Towery v. Towery*, 285 Ark. 113, 685 S.W.2d 155, 156 (1985) (no obligation to support adult son who became quadriplegic in automobile accident),[17] *cited in Van Camp v.*

157, *quoting Grapin v. Grapin*, 450 So.2d 853 (Fla.1984). The *Towery* court expressly stated that it declined to elevate a moral obligation into law where there was none established by statute. *Towery*, 685 S.W.2d at 158. Dissenting *Towery* Justice Hays would have found a duty to support, relying on *Matthews v. Matthews*, 245 Ark. 1, 430 S.W.2d 864 (1968) (father's duty of support "only … slight[ly] exten[ded]" six months past age of majority, so daughter could finish high school). *Towery*, 685 S.W.2d at 157, 159.

*Van Camp,* 333 Ark. 320, 969 S.W.2d 184, 186 (1998) (obligation held legally binding when spouse undertook to support children through college in divorce settlement; no difference between that kind of agreement and any other enforceable contract).

The Court notes that, again, this aspect of Plaintiff's case presents yet another painful collision between that which is morally commendable and that which is legally required. Also again, this Court reluctantly concludes that it cannot premise a finding of undue hardship on Plaintiff's having assumed a responsibility voluntarily, for which there may be a moral, but no legal, duty to assume.

Accordingly, the Court finds that Plaintiff should be able to apply the monies from her daughter's support to make good on Plaintiff's debt to Defendant. There can be no undue hardship on these facts.

### 3. *Other particular circumstances.*

The Court can find no other unique circumstances requiring consideration in this case. Discharge must be denied.

Based upon the foregoing, the Court finds that the Plaintiff has failed to establish by a preponderance of the evidence that she is entitled to an "undue hardship" exception pursuant to Section 523(a)(8)(B). The record evidence to the contrary reflects that Plaintiff is a very capable attorney, who has chosen to practice law to provide needed legal services to the poor and disadvantaged rather than to seek profitable income in order to satisfy her student loan debt. The code does not provide that student loan debtors can satisfy their obligations in this manner, by substituting pro bono service. Accordingly, her student loan debt is hereby determined to be nondischargeable.

IT IS SO ORDERED.